500 P.2d 335

Coy L. PURCELL and Tucson General Hospital, a corporation, Appellants,

v.

Thelma ZIMBELMAN, as Administratrix of the Estate of Henry Zimbelman, Deceased, Appellee.

No. 2 CA–CIV 1130.

Court of Appeals of Arizona, Division 2.

July 20, 1972.

Rehearing Denied Aug. 21, 1972.

Review Denied Oct. 10, 1972.

78

Lesher & Scruggs by D. Thompson Slutes, Tucson, for appellant Tucson General Hospital.

Chandler, Tullar, Udall & Richmond, by Jack Redhair, Tucson, for appellant Coy L. Purcell.

Miller, Pitt & Feldman, by Stanley G. Feldman, Tucson, for appellee.

HOWARD, Judge.

This was an action for negligence against a hospital and several doctors. Prior to submission to the jury, all doctors were dismissed from the action except Dr. Purcell.

The jury returned a $150,000 verdict against both the hospital and Dr. Purcell. In this appeal the hospital presents the following questions:

"1. In order to prove a prima facie case, must the plaintiff prove that defendant's alleged negligence caused injury to the plaintiff? Specifically, in this case, was the plaintiff required to prove that the hospital's alleged negligence in failing to restrict or supervise Dr. Purcell after the Blickley and Hill cases resulted in the injury to the plaintiff?

2. Even though it may be proper to introduce into evidence the fact that a doctor has been sued on two previous occasions for malpractice on the issue of whether or not a hospital had notice of the doctor's possible incompetency, is it proper to advise the jury of every fact and circumstance of those lawsuits including the judgments rendered, and is it further proper to introduce into evidence two other lawsuits which have nothing to do with the disease or treatment at issue in the instant case, and in which there is no evidence that the doctor was guilty of professional negligence?

3. If a physician called to testify as an expert witness about the standard of practice of hospitals testifies that a hospital should restrict or supervise anyone who is proven guilty of malpractice on two occasions, and that his hospital does so, is it error to restrict the cross-examination of that witness so as to prevent the introduction of evidence of the fact that many doctors at that hospital have been adjudged guilty of negligence on more than two occasions, and have not been restricted in any manner?

4. May a medical treatise or article be used substantively, in light of the fact that the article is hearsay and there is no opportunity to cross-examine the writer?

5. When one of the primary issues in the trial is the location of an obstruction in the plaintiff's bowel, is it error to deny the defendants the right to call a radiologist as a witness who can testify as to the location of the obstruction by reading a barium enema x-ray in evidence?

6. Was it error to deny a motion for mistrial when a witness who was called to testify to alleged prior malpractice by Dr. Purcell inaccurately said, 'I won my case' (against Dr. Purcell) shortly before her counsel advised the jury that she had sued for '6 figures or more,' since such evidence would indicate the erroneous concept that Mrs. Hill, the witness, had sued Dr. Purcell and had successfully recovered '6 figures or more?'

7. What is the duty of a hospital toward its patients? Is it liable for the negligence of physicians who are not employees but are on its staff, and acting as staff members or committee members? Is a hospital liable for the failures of its

surgical staff if it does not have reason to know that the surgical staff is not policing itself properly?"

Dr. Purcell presents the following questions for review:

"1. Where this appellant [Dr. Purcell] was charged with negligence in the management of a single patient, was the trial court in error in refusing to grant this appellant's motion for severance when the jury heard substantial testimony concerning four other units of litigation?

2. Where an entire hospital file is in evidence, did the court abuse its discretion in refusing to allow this defendant to call a witness to interpret the x-rays of the plaintiff?

3. Did the court commit error in the giving of plaintiff's instruction number 3, 'Error in Judgment' and the refusal to give defendant's instructions 6, 7 and 8?"

The facts considered in the light most favorable to support the verdict are as follows.

In April of 1969, Henry Zimbelman, 62 years of age, began having trouble with his bowels. He went to an osteopathic general surgeon who found an obstruction in the descending colon and admitted Zimbelman to Tucson General Hospital on April 14, 1969. Dr. Coy Purcell, a general surgeon, was asked to consult. Purcell's initial diagnosis was that Zimbelman had either cancer or diverticulitis[1] of the lower large bowel. The trouble in Zimbelman's case was located above the peritoneal reflection.[2] A barium enema x-ray report showed a complete obstruction in the area of the rectosigmoid junction.[3]

Zimbelman was also given a sigmoidscopic examination by Purcell which consists of the insertion of a tube-like instrument called a sigmoidscope through the anus, up the rectum and into the colon. According to the testimony of Purcell the sigmoidscope passed 17 cm. from the outlet of the anus, which meant that it passed through the entire rectum, through the peritoneal reflection and into the rectosigmoid junction. This meant that the diseased portion of the bowel was located at least 17 cm. above the outlet of the anus.

On April 18, 1969, Purcell operated on Zimbelman and found a lesion running circularly around the rectosigmoid colon. Since Purcell could not tell by sight whether the lesion was cancerous he had a pathologist come into the operating room to look at the tissue. Although surgical standards require the surgeon to obtain a frozen section[4], relying on the pathologist who said the lesion looked like cancer, Purcell performed a "cancer operation" called a "Babcock-Bacon proctosigmoidectomy."[5] This procedure was first described by and is named after Drs. Babcock and Bacon and is also called a "pull-through" operation.

In doing the "pull-through" Purcell first opened the abdomen and removed a piece of the bowel. The uppermost portion of what was removed was three inches above the point of the lesion. Purcell then took the end of the remaining bowel (called the proximal end) and "pulled it through" the peritoneal reflection into the rectum, where he attached it at the anus. All of the bowel and rectum below the proximal end of the resection were thus discarded. Purcell did not first institute a temporary colostomy[6] because he did not think it was necessary,

1. Inflammation of the little sacs formed along the large intestine.

2. The bottom of the abdomen.

3. The rectum is the last part of the colon. The sigmoid is the part of the colon preceding the rectum. Both parts are continuous and represent arbitrary divisions of the large bowel, mainly for convenience of reference.

4. The frozen section can be done while the patient is on the operating table.

5. The disease turned out to be diverticulitis.

6. The formation of an artificial outlet for discharging the contents of the colon through the wall of the abdomen.

even though there had been contamination of this proximal end before he pulled it through into the rectal area and attached it to the anal outlet and even though he knew there had been an infectious process in the abdomen.

Purcell testified that he could not have performed an anterior resection [7] on Zimbelman because the lesion was low down in a cylindrical pelvis, he had an inadequate cuff and had no room to work.

As a result of the "pull-through" operation Zimbelman suffered from loss of sexual functions, loss of a kidney, a permanent colostomy and urinary problems.

Dr. Griess, the former chief of staff of St. Mary's Hospital in Tucson, testified that the choice of treatment on Zimbelman should have been an anterior resection and not a "pull-through." Dr. Clements testified that Purcell's failure to perform an anterior resection fell below the standard of the average competent bowel surgeon. The surgeons were relatively unanimous in the opinion that a "pull-through" was an operation designed only for disease located below the peritoneal reflection and that where, as in Zimbelman's case, the problem is located above the peritoneal reflection, even if low-down, there is no indication for doing a "pull-through."

Dr. Clements testified that the inherent risks of a "pull-through", especially one performed without a diverting colostomy, are high.

The court admitted testimony concerning two patients who were treated by Purcell prior to Zimbelman. Francis Blickley was treated by Purcell in 1965 for a condition which Purcell suspected of being either cancer or diverticulitis of the lower portion of the colon.

One year later Purcell treated a Hattie Hill for a condition which Purcell suspected of being either cancer or diverticulitis of the colon.

Both were cases of diverticulitis and in neither case did Purcell perform an anterior resection.[8] Blickley and Hill were later treated by Dr. Griess for complications resulting from Purcell's treatment. Dr. Griess performed an anterior resection on Blickley and was eventually able to restore bowel continuity.

Dr. Griess attempted to perform an anterior resection on Hattie Hill but he was unable to do so because of her prior treatment. As a result of Purcell's failure to perform an anterior resection on Mrs. Hill she was left with a permanent colostomy.

Both Hill and Blickley sued Purcell and the hospital. Two other patients of Dr. Purcell sued Purcell and the hospital. All suits occurred prior to Purcell's treatment of Zimbelman.

NEGLIGENCE OF THE HOSPITAL

Zimbelman's theory against the hospital was that the hospital had a duty to the public to allow the use of its facilities only by such independent staff doctors as are professionally competent and who treat their patients in full accordance with accepted and established medical practices, and that the hospital breached its duty when it failed to take any action against Purcell when it knew, or should have known, that he lacked the skill to treat the condition in question.

The hospital claimed that it could not be liable for Purcell's malpractice since he was an independent contractor and there was no reason to believe that a specific act of malpractice would take place.

The hospital has been accredited by the American Ostopathic Association. In order to be accredited by that association in the first instance and in order to maintain its accreditation, the association requires that the governing body of the hospital, to wit

---

7. The procedure ordinarily used by surgeons in treating a ruptured diverticulum. In performing the operation the fecal stream is diverted by a temporary colostomy, the diseased section of the bowel is cut out, the bowel is then resected and the temporary colostomy is closed.

8. Dr. Purcell stated he did not do an anterior resection in the Blickley case because of an inadequate cuff.

the board of trustees, be properly organized and mandates that this governing body must have the ultimate responsibility for the quality of patient care rendered in the hospital. In addition, the association requires creation of a professional staff. According to the Basic Accreditation Requirements of the American Osteopathic Association, the following is required:

"The governing authorities of the hospital have a responsibility of selecting its professional staff to assure the community that the physician to whom it extends the privilege of the use of its facilities are professionally competent and will offer optimum patient care. . . ."

Pursuant to the requirements of the association, a professional staff was created at the hospital. By-Laws, approved by the board of trustees of the hospital state:

"Fully recognizing that the governing authority of any hospital serving the public has not only the right, but also the responsibility in selecting its professional Staff to assure itself, and through it the public, that the doctors to whom it extends the privileges to the use of its facilities are professionally competent and ethically sound, and that such governing authority of the hospital has a moral, as well as a legal, obligation toward the patient, the recognition of which enables the person requiring hospital care to enter the institution confident that the treatment he or she will receive there will be in full accordance with accepted and established practice, the Professional Staff of the Tucson General Hospital, Osteopathic, sets out the following purpose: . . ."

The evidence further established that it was the practice among hospitals all over the country to establish and operate review and other committees for the purpose of regulating the privileges granted staff doctors and to insure that privileges are conferred only for those procedures for which the doctor was trained and qualified. Doctor Griess testified that the custom and practice among hospitals was to actually monitor and review the performance of staff doctors and to restrict or suspend their privileges or require supervision when such doctors have demonstrated an inability to handle a certain type of problem.

■■■ Dr. Myers, a member of the board of trustees of the hospital, admitted that the hospital was aware of the custom and practice, subscribed to it and attempted to follow it. In spite of the foregoing, the hospital maintains that since the Blickley and Hill cases were presented to the Department of Surgery, a group of independent doctors on the professional staff, the hospital cannot be liable for the inaction of the surgical department. We are unable to agree with this position. The Basic Accreditation Requirements of the American Osteopathic Association and the By-Laws of the Professional Staff of Tucson General Hospital approved by the board of trustees of the hospital demonstrate that the osteopathic doctors themselves and other responsible authorities regard as both desirable and feasible that a hospital assume certain responsibilities for the care of its patients. The hospital had assumed the duty of supervising the competence of its staff doctors. The Department of Surgery was acting for and on behalf of the hospital in fulfilling this duty and if the department was negligent in not taking any action against Purcell or recommending to the board of trustees that action be taken, then the hospital would also be negligent. It cannot be gainsaid that it was a jury question as to whether or not the hospital, acting through its Department of Surgery, was negligent.[9]

9. In Joiner v. Mitchell County Hospital Authority, 125 Ga.App. 1, 186 S.E.2d 307 (1971), the court stated:
"... The mere fact that he was a licensed physician of the State of Georgia recommended by the other doctors on the staff as required by law does not overcome the averments that the hospital was negligent in failing to exercise care in determining his professional competency should it later appear by evidence that the doctor was an incompetent or unskillful physician." 186 S.E.2d at 309.

## PROXIMATE CAUSE

The hospital argues that Zimbelman failed to prove that it caused his injuries because there was no showing as to what action the hospital would have taken with respect to Dr. Purcell. It contends that ". . . if the hospital should have suspended Dr. Purcell in the Hill case, then a suspension could have lasted for a period of six months. Let us assume that the hospital restricted Dr. Purcell for a six-month period and not let him perform any surgery on diverticulitis during that time. If that had happened, then according to Dr. Griess the hospital would have performed whatever duties to the public that it had. Yet, even if that restriction had taken place, it is still entirely possible and probable that the Zimbelman case would have occurred exactly as it did occur. The Blickley and Hill cases were over in 1965, and therefore a six-month or even a three-year suspension would have been terminated by the time Henry Zimbelman presented himself to Tucson General Hospital."

The hospital further maintains, since after the Hill and Blickley cases Dr. Purcell recognized that the proper way to handle diverticulitis was by anterior resection and had performed some anterior resections, that ". . . once it would have become clear to any hospital department or committee that a problem in the Hill or Blickley case had been cleared up—that Dr. Purcell now realized that a diseased portion of the bowel must be taken out—then obviously there would have been no reason to continue any such suspension because of the Blickley and Hill cases." We do not agree with the hospital's contention.

■■ An essential element of the plaintiff's cause of action for negligence is that there must be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered. On the issue of the fact of causation the plaintiff has the burden of proof. He must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. This "substantial factor" test has been applied by our Supreme Court in determining whether or not there was causation in fact.[10] McDowell v. Davis, 104 Ariz. 69, 448 P.2d 869 (1969); and see Herzberg v. White, 49 Ariz. 313, 66 P.2d 253 (1931). Although a mere possibility of such causation is not enough, the plaintiff is not required to prove his case beyond a reasonable doubt and he need not negate entirely the possibility that defendant's conduct was not a cause. Cornbrooks v. Terminal Barber Shops, 282 N.Y. 217, 26 N.E.2d 25 (1940). All that is required in negligence cases is for the plaintiff to present probable facts from which negligence and causal relations may be reasonably inferred. E. L. Jones Constr. Co. v. Noland, 105 Ariz. 446, 466 P.2d 740 (1970).

As aptly stated in Prosser, Law of Torts § 41, at 242 (4th ed. 1971):

". . . The fact of causation is incapable of mathematical proof, since no man can say with absolute certainty what would have occurred if the defendant had acted otherwise. Proof of what we call the relation of cause and effect, that of necessary antecedent and inevitable consequence, can be nothing more than 'the projection of our habit of expecting certain consequents to follow certain antecedents merely because we had observed these sequences on previous occasions.' If as a matter of ordinary experience a particular act or omission might be expected, under the circumstances, to produce a particular result, and that result in fact has followed, the conclusion may be permissible that the causal relation exists.

. . . Thus it is everyday experience that unlighted stairs create a danger that someone will fall. Such a condition 'greatly multiplies the chances of ac-

---

10. In this context the test is one of significance, rather than of largeness or smallness or quantum. *See* McDowell v. Davis, infra.

cident, and is of a character naturally leading to its occurrence.' When a fat woman tumbles down the steps, it is a reasonable conclusion that it is more likely than not that the bad lighting has played a substantial part in the fall. When a child is drowned in a swimming pool, no one can say with certainty that a lifeguard would have saved him; but the experience of the community permits the conclusion that the absence of the guard played a significant part in the drowning. Such questions are peculiarly for the jury; . . . whether reasonable police precautions would have prevented a boy from shooting the plaintiff in the eye with an airgun, are questions on which a court can seldom rule as a matter of law. And whether the defendant's negligence consists of the violation of some statutory safety regulation, or the breach of a plain common law duty of care, the court can scarcely overlook the fact that the injury which has in fact occurred is precisely the sort of thing that proper care on the part of the defendant would be intended to prevent, and accordingly allow a certain liberality to the jury in drawing its conclusion."

We believe it reasonably probable to conclude that had the hospital taken some action against Dr. Purcell, whether in the form of suspension, remonstration, restriction or other means, the surgical procedure utilized in this case would not have been undertaken by the doctor and Mr. Zimbelman would not have been injured.

■ Since the question of causation in fact is for the trier of fact, *see* Hlavaty v. Song, 107 Ariz. 606, 491 P.2d 460 (1971), the court did not err in submitting it to the jury.

## EVIDENCE OF OTHER CLAIMS

The hospital urges that the admission of evidence regarding the Blickley, Hill, Kelly and Wolford cases was prejudicially erroneous. Specifically, it complains that the jury was permitted to hear that Dr. Purcell

had been sued on four previous occasions, that Mr. Blickley had recovered a judgment against Dr. Purcell, that Mrs. Hill had "won her case" after suing for "six figures or more", and that the Kelly and Wolford cases had been filed against both Purcell and the hospital.

■ Since the negligence of the hospital was predicated upon failure to perform its obligation to Zimbelman to see to it that only professionally competent persons were on its staff, it follows that its knowledge, actual or constructive, of Dr. Purcell's shortcomings, was an essential element for consideration in determining whether or not the hospital exercised reasonable care or had been guilty of negligence. Where knowledge of a danger is an issue, evidence of the occurrence of other accidents or injuries from the doing of a particular act or the employment of a particular method on occasions prior to the one in question is admissible to show that the person charged knew or should have known of the danger therein, provided it is shown that the conditions of the previous occurrences were the same or substantially similar to those of the one in question. It is not necessary however, to show that such incidents occurred under circumstances precisely the same as those of the one in question—similarity in general character suffices. Slow Development Co. v. Coulter, 88 Ariz. 122, 353 P.2d 890 (1960).

■ The hospital contends that the evidence of other past acts was inadmissible in the case at bench because the alleged act of negligence in Zimbelman's case was not quite the same as in the Blickley and Hill cases. We do not agree. In all three cases an anterior resection was required and was not performed. There was a sufficient similarity in such conduct so as to make the Blickley and Hill cases admissible as to the hospital. As to the admissibility of the Kelly and Wolford cases against the hospital, Dr. Griess testified that untoward results in prior cases would be sufficient in and of itself to require a

hospital to undertake a review of the records of those incidents. There was evidence that a negligence suit against a doctor would be further grounds which would require a competent hospital to review the doctor's records. Dr. Griess also testified that where the hospital was joined in a lawsuit, review of the doctor's records was even more of a requirement. Therefore, evidence of the filing of the Hill, Blickley, Kelly and Wolford lawsuits was admissible against the hospital on the question of notice, not only as to the particular type of operation and ailment that was involved, but as to the general competency of Dr. Purcell to continue to be a member of the hospital staff.

The hospital next questions the action of the trial court in allowing into evidence the fact that there was a verdict against Dr. Purcell in the Blickley case and that Hattie Hill had sued for an amount in excess of six figures. One of the hospital's theories of defense was that nothing had ever occurred to give it cause to believe that the privileges of Dr. Purcell should be suspended or restricted in any manner. On direct examination Dr. Myers, a member of the board of trustees of the hospital and a member of the hospital staff, was asked whether or not, as a member of the board, anything had come to his attention to make him believe that Dr. Purcell should have had his privileges either restricted or changed. His answer was "No." On cross-examination, Zimbelman's attorney asked the following question:

"Q. Now, Mr. Slutes asked you, in the last question he asked, and I tried to write it down as accurately as I could, was this: 'Has anything come to your attention, as a member of the board, to make you believe that Dr. Purcell should have had his privileges either qualified or restricted or changed'? ‗ believe the answer was no; is that correct?

A. That's correct.

Q. Now, Mr. Zimbelman was operated on in this case, Doctor, in April 1969. Now, before April of 1969, before that date, the question of Francis Blickley came to the court; didn't it?

A. Not that I recall.

Q. And, Doctor, wouldn't the fact that Francis Blickley brought a lawsuit against Dr. Purcell on July 9, 1965, and that the case was actually tried in a courtroom to a judge and a jury and a judgment against Dr. Purcell was rendered on April 18, 1967 of finding a judgment that Dr. Purcell had handled the Blickley problem in a manner below the standard of care, wouldn't that have been a fact that the board would have considered to have justified taking some action?"

 At that point an objection was interposed. The Wolford and Kelly cases involved suits not only against Dr. Purcell but also against the hospital, yet, Dr. Myers testified that the board of trustees of Tucson General Hospital was unaware of the suits. Dr. Myers did not admit that the board of trustees of the hospital was aware of the suits, but was willing to only say that it was very possible. The entire line of questioning as to the Blickley verdict, the amount of the Hill complaint and the Kelly and Wolford suits against both Purcell and the hospital was directly relevant to the hospital's defense of lack of knowledge of any past misdeeds on the part of Dr. Purcell.[11] Where a hospital's alleged misconduct involves an omission to act, the hospital will not be held responsible unless it had reason to know that it should have acted within the duty it concededly had. See Fiorentino v. Wenger, 19 N.Y.2d 407, 280 N.Y.S.2d 373, 227 N.E.2d 296 (1967). The evidence as to the Blickley, Hill, Kelly and Wolford suits

11. Hill's response that she had won her case against Dr. Purcell came when she was being cross-examined by the hospital's counsel. The trial court concluded that the answer was invited by the hospital's questioning. We agree. In any event it was stricken. We believe it was admissible as against the hospital on the notice issue.

was clearly admissible to prove that the hospital had reason to know or should have known of the conduct of Dr. Purcell.

As for the admissibility of these cases against Dr. Purcell, the record shows that prior to trial, Dr. Purcell joined with the hospital in a motion *in limine* requesting the court to prevent Zimbelman from introducing any evidence on the Blickley, Hill, Kelly or Wolford cases. This motion was denied by the court on the grounds that it felt the evidence was admissible against the hospital on the issue of notice. Denial of a motion *in limine* does not prevent counsel from subsequently objecting to such evidence since valid objections may develop during the course of ′the trial. Oftentimes the court will deny the motion *in limine* since it feels that it cannot adequately rule on the motion until the evidence has further developed. Counsel for the defendants apparently recognized this fact since during the course of trial, and before evidence of the prior difficulties was introduced, they objected on the basis of relevancy. The trial court agreed that this relevancy objection could be a continuing one. The testimony concerning the Blickley and Hill cases was relevant as to Dr. Purcell since it tended to show his inability to properly treat diverticulitis and his misconception of the proper surgical treatment to wit: an anterior resection.

As for the Kelly and Wolford cases, this testimony was adduced during the cross-examination of Dr. Myers to show notice on the part of the hospital and was admissible for such purpose.

In its instructions to the jury at the end of the case the court told the jurors they were not to consider the Kelly and Wolford cases in connection with the claim against Purcell. This was all to which Purcell was entitled.

## SEVERANCE

On the first day of the trial after the motion *in limine* was denied, Dr. Purcell moved the court to sever the claims against the hospital and himself and order separate trials. This motion was denied but was renewed at the end of the plaintiff's case. Purcell claims the court erred when these motions were denied. We do not agree. A month and a half prior to trial Dr. Purcell was put on notice that the plaintiff intended to introduce evidence of the four prior cases. The trial court has broad discretion in determining whether the issues should be tried together or severed for trial. Ulan v. Richtars, 8 Ariz.App. 351, 446 P.2d 255 (1968). Considering the fact that at least the Hill and Blickley cases were admissible as against Purcell and further considering the fact that the motions were not made until the first day of trial, we do not believe the trial court abused its discretion in refusing to grant the severance.

## DENIAL OF CROSS-EXAMINATION

During cross-examination of Dr. Griess by the hospital's counsel the following took place:

"Q. Well, you were telling us yesterday about what the hospital should or should not do and we were talking about Francis Blickley and Hallie [sic] Hill as regarding Dr. Coy Purcell, and you said that there should have been a review, if the man is sued, the hospital passes it over would be bad, and if he does something bad the first time that falls below the standard of practice on one occasion, they should be warned, and if it proved to the hospital's satisfaction that he fell below the standards of practice the second time, something further should be done to him. You didn't specify what it is; up to the medical committee or board of governors or credentials committee or somebody to sanction that man in some manner?

A. That's correct.

Q. By the same token, if he is sued on the first case, and found to have fallen below the standards of practice, he should be warned; if he's sued in the second case and it is determined that the reason the man did not perform the surgery was because

the patient refused the surgery, do you say that that man should be restricted?

. . . . . .

A. Well, you can't hold a surgeon liable for something where a patient refuses to have surgery done, of course.

Q. Thank you, Doctor. One step further, let me go. Let's talk about a hypothetical surgery, for a moment, and this man had done two things; wrong surgeon, and you say he should be suspended or supervised or something. Do you have an idea how long a time that would be, or is that to vary also?

A. It would vary greatly. It would depend upon the staff, the executive committee what they decided.

Q. Would he be suspended or supervised for as long as a year?

A. A year, maybe three years.

Q. As short as six months; it varies.

A. Yes.

Q. It is the judgment decision for the surgical committee; is that right, Doctor?

A. I think more for the executive committee.

Q. Unless and until they come to the point where it is their feeling this man has learned whatever lesson he is supposed to have learned by being suspended, restricted and so forth; is that right?

A. Well, until he changes his ways, I suppose.

Q. Either one?

A. Yes.

Q. Right?

A. Yes.

Q. Doctor, are you still on these committees at St. Mary's?

A. No, since I was chief of staff; then you—well, start over again.

Q. All right. When you were chief of staff?

A. Finished in 1965.

Q. Are you aware of what the committees out there have been doing in the last six years with regard to censoring, suspending and so forth, physicians?

A. Yes.

Q. Can you tell me the fact that the physicians who have been sued, and where the records have been reviewed, and they have been found to have fallen below the standards have been restricted?

A. Oh, yes.

Q. If they have been found to have fallen below the standards two or three times, are they off the staff now?

A. Yes.

Q. Every one of them?

A. Well, one is that I can think of, particularly.

Q. The one you think of?

A. One.

Q. You say you practice at all three hospitals, St. Joseph's, Tucson Medical Center, and St. Mary's?

A. Yes.

Q. Are you familiar with all of the committee setups of those hospitals?

A. Well, you see I do most of my work at St. Mary's, and I don't serve on these other committees, simply because I don't do enough work there, so their committees are essentially set up like St. Mary's, but I can't tell you exactly how they do it.

Q. You know Dr. [name omitted]?

A. I do.

Q. Is he competent?

A. Yes.

Q. Especially on orthopedic surgery?

A. Yes.

Q. To your knowledge has any hospital in Tucson restricted, suspended or supervised him in the last two years or deprived him of any privileges?

MR. FELDMAN: I object to that.

THE COURT: Sustain the objection.

Q. I suppose this will be a similar objection; similar ruling to—

THE COURT: Yes, I think the whole area is immaterial; as to particular indi-

viduals I think it's immaterial. You can ask about generally what they do, but I don't think the particular problems—

MR. SLUTES: I'm trying to find out if they do things specifically.

THE COURT: Sustain the objection. I will allow you to make a record on it later.

MR. SLUTES: Thank you, Your Honor. Fine, I have no further questions, and thank you."

The hospital's attorney contends that the court's sustaining of Zimbelman's objection unduly restricted his cross-examination since he was prepared to ask Dr. Griess if in fact twelve particular doctors whose background had been researched had not been found guilty of malpractice on at least two occasions and had not had their privileges restricted in any manner.

■ We find no merit in the hospital's contention. The record reflects that the court afforded it an opportunity to pursue his cross-examination. The following in-chamber discussion indicates this and since the hospital did not avail itself of the opportunity to recall Dr. Griess, it cannot now complain.

"MR. SLUTES: Well, first I would like to make an offer of proof, I suppose, by avowal, unless Mr. Feldman would rather have me bring Dr. Griess back with regard to the evidence I attempted to elicit from him regarding other physicians in the community, who have been adjudged guilty of malpractice and still have privileges in the hospital.

THE COURT: You can do it by avowal.

MR. SLUTES: Thank you.

I would avow that Dr. Griess, if asked, would testify that there are any number of surgeons and physicians in Tucson, who are not competent to practice and who are practicing only because the hospitals have not gotten after them. I asked him specifically or would ask him specifically about Dr. [name omitted].

THE COURT: I didn't keep you from asking general questions in the nature that you framed. What you've said so far as to whether or not there are a number of physicians practicing who have not been denied staff privileges by the hospital; where I sustained the objection was where you were starting to go into individual physicians.

MR. SLUTES: Well, it would seem to me that is the way to prove it by individuals.

THE COURT: Well, at this point I don't there [sic] has ever been anything raised before the Court as to whether you could prove by general questions—I don't think there is or was.

MR. FELDMAN: Before counsel goes on with his avowal for the record, he didn't ask me whether he could talk to Dr. Griess. He probably doesn't have to. He was engaged in a casual, friendly conversation with Dr. Griess. I don't know what they said; I will take Tom's word for it, but I am sure Dr. Griess, if he did agree, so and so, was negligent and was not competent, and another guy wasn't competent, I am sure Dr. Griess never imagined in all the world that was going to be spread over the records of this courtroom, so everybody could go out and tell Dr. Jones that you know Donald Griess thinks you are incompetent, and I think that—

THE COURT: This goes to show you tell a lawyer, unless you want it brought out—

MR. FELDMAN: I don't think Mr. Slutes wanted to. I don't think it is fair to put the witness in that kind of position. I don't know who they may have discussed a—who they may not have discussed, but I feel here I'll bring a doctor into the courtroom and I didn't think any witness ever bargained to being put in that position.

THE COURT: I think if Dr. Griess is willing to say something out in the lobby to a person, he is bound to say the same thing in court.

MR. FELDMAN: If it were admissible, and the Court had ruled that it is not, and now by an offer of proof—can I have just a second to talk to Mr. Slutes?

MR. SLUTES: We can't cure it. I used two names specifically and one name I couldn't catch.

THE COURT: Refer to them as "A", "B", and "C". Their names aren't important for the record, are they?

MR. SLUTES: Well—

MR. FELDMAN: Their names aren't important for the record; I'll stipulate at this time there were three doctors named and whatever Mr. Slutes—

THE COURT: Why do you need to say the particular names? State two or three specific doctors.

MR. SLUTES: Three specific doctors; we could have had more, I'm sure, but then he was willing to talk about it, because he was mad, and I will stipulate he was mad, and he will—was talking about the physicians in this community who are not competent to practice surgery, and the reason they are practicing is because the hospitals and other committees don't get after them, and I was prepared, on my cross examination of Dr. Griess, to read to him the names of probably a dozen doctors who I have personal knowledge of should be adjudged by their peers to have been guilty of malpractice, and whose staff privileges have not been touched in this town, which leads be to this point, with regard to where this cross examination is material: first, it shows that what Dr. Griess actually testified to on direct was the way he thinks things should be rather than the actual standard of practice as followed by hospitals in this community. What he is saying is hospitals should exercise this degree of control; should discipline the people, and should do this upon one or two steps; by cross examination I could have shown if the hospitals don't do that and since we are talking about standards of practice I think I was entitled to do that.

Secondly, I think it is important on the issue of bias and prejudice of Dr. Griess in showing that he is, and there is no question about this, but he is a highly critical and overcritical man, and perhaps these other doctors need not have been censored for what they did, but Dr. Griess is ready to lean forward and say many doctors are incompetent and should be censored; this would have helped me to establish this fact. This man is a biased witness which would have led me into the third part, and that is, how little he thinks of osteopaths, and when he has an osteopathic doctor on the carpet, he is really going to give it to him.

I want to start with an M.D. and go into D.O.s and I was precluded from doing that.

THE COURT: Either I misunderstood your intent, or you misunderstood my ruling; one or the other.

I think that in the future—if you had wanted to ask him as a question "Doctor, aren't there at least ten medical doctors who you feel are not competent to practice but still have full staff privileges at the local hospitals" I think such a question would have been entirely proper, but what it appeared to me you wanted to do and even more so, because I saw that you had a list that looked like a list of names, it appeared to me you were going to take specific doctors and go into each doctor, one by one, which I thought would not be— would be immaterial, as far as our case is concerned, but if you wanted to show it was a general practice of hospitals not to lift privileges or restrict privileges, even though doctors might be considered by their peers to be incompetent, why it would have been entirely proper for you to do so. The same would have applied to either M.D.s or D.O.s and this—there is one other matter you got into in your offer of proof which was in no way indicated by your questions that you posed.

MR. FELDMAN: On the bias problem?

THE COURT: Yes, to show that Dr. Griess—well, show first that he was overly critical, that was in no way in the case by your questions, and I think that was improper to bring out, to show that he had some type of bias against the profession of doctors of osteopathy. I think that would have been entirely proper.

I don't think that by my ruling on a particular question you were starting to ask that it would have in any way precluded you from going into these other matters.

MR. SLUTES: Your Honor, when I speak of bias, I am not speaking of the bias against D.O.s. I am speaking of Dr. Griess. It is not, I think, my request would have led to the point that Dr. Griess is not an objective witness, that he is willing to, in effect, say that almost anybody who falls below his standard of care is negligent. Let me make the point about the thing.

THE COURT: On that particular point I don't think that—well, it was not my intention at all to preclude you from bringing out things like that, just by saying you couldn't go into a situation where there wasn't—which one did you mention, the other O.D.? It wasn't Dr. [name omitted]; wasn't Dr. [name omitted] sued and didn't that result in some form of limitation—I think you would be perfectly entitled to, if you want to call him back, and go into those matters, I will allow you to.

MR. SLUTES: Let me make one other point on the hospital business. The reason I started to go into the individual cases is does St. Mary's follow the practice you have described to us? I know he is talking about one person. Now he's already said that the standards requires hospitals to knock guys off or restrict them if they are found guilty of malpractice, and by saying we have done it at St. Mary's, implies the further fact St. Mary's follows his standard of practice. It implies that the only men practicing at St. Mary's who have been found guilty of incompetence, and the reason we have to go case by case is to point out to him that what happened is not true; that as a matter of fact, Doctor "A" has been found guilty of malpractice on several occasions, and he is still at St. Mary's, isn't he, Doctor?

MR. FELDMAN: The one question to your question, the people who have had their questions completely terminated.

MR. SLUTES: I agree.

MR. FELDMAN: That doesn't mean that is the only one and he never said that was the only one that had been negligent.

THE COURT: I don't think you asked the question as to how many might have been disciplined in one way or another by restrictions or suspensions. I think you asked about terminations.

If you want to call him back, and go into these matters from a different approach, I will allow you to do it.

MR. SLUTES: Thank you, I'll consider it."

## MEDICAL TREATISES

Dr. Clements, Zimbelman's witness, was asked questions during cross-examination about a treatise written by a Dr. Shakelford. In particular, the following questions were propounded in relation to Shakelford's work:

"Q. And would you agree, then, Doctor, that Bacon says that the pull-through operation may be employed for all operative cancers, between the level of the midsigmoidal and low rectum?

A. If we are quoting Bacon, I will also show you where his [sic] says it should be done only between the seventh and twelveth [sic] centimeters.

· · · · · ·

Q. [By] that sentence the mass was found within the area of where you do the . . . Babcock-Bacon . . .?

A. Not according to Bacon's writings, no; if it is above twelve centimeters.

Q. You told us on deposition, sir, that Bacon says it was as low as seven meters and as high as fourteen centimeters; isn't that true?"

On re-direct examination Zimbelman's counsel referred to the cross-examination regarding Shakelford's citation of Bacon. The doctor referred to an article entitled "Pull-Through Operations for Cancer of the Rectum" authored by Bacon and another doctor. The doctor was then permitted, over objection of counsel for the hospital, to read from the article. The au-

thors, in discussing surgical management of carcinoma of the rectum and colon, stated that there is uniformity of opinion that lesions situated twelve to fourteen centimeters above the anal verge (outlet) are best managed by anterior resection and re-establishment of intestinal continuity. The hospital claims that the court erred in permitting Dr. Clements on re-direct examination to read from the article by Bacon, for the reason that the article was then being used substantively and not for cross-examination or impeachment.

■ The general rule is that extracts from medical books or treatises are not admissible to prove the truth of statements contained therein. United States v. One Device, etc., 160 F.2d 194 (10th Cir. 1947); Darling v. Charleston Community Memorial Hospital, 50 Ill.App.2d 253, 200 N.E.2d 149 (1964); Kavanagh v. Butorac, 140 Ind.App. 139, 221 N.E.2d 824 (1967); Koury v. Follo, 272 N.C. 366, 158 S.E.2d 548 (1968); Gravis v. Physicians & Surgeons Hospital, 415 S.W.2d 674 (Tex.Civ. App.1967); Dabroe v. Rhodes Co., 64 Wash.2d 431, 392 P.2d 317 (1964); Rice v. Clement, 184 So.2d 678 (Fla.App.1966); Annot., 84 A.L.R.2d 1338 (1962). It is also the rule that an expert witness may be cross-examined as to whether he admits other books are recognized as standard authority and, upon such admission, may be confronted with statements in those books. Lawrence v. Nutter, 203 F.2d 540 (4th Cir. 1953); Reck v. Pacific-Atlantic S. S. Co., 180 F.2d 866 (2d Cir. 1950); State Highway Dept. v. Willis, 106 Ga.App. 821, 128 S.E.2d 351 (1962); Ruth v. Fenchel, 21 N.J. 171, 121 A.2d 373 (1956); Hemminghaus v. Ferguson, 358 Mo. 476, 215 S.W.2d 481 (1948). Medical treatises and texts can also be used on re-direct examination if they are offered not to prove the truth of the words stated therein. In Seattle First Nat'l Bank v. Rankin, 59 Wash.2d 288, 367 P.2d 835 (1962), the books were used in order to explain certain passages which were read before the jury on cross-examination and to clarify possible misunderstanding by the jury which might have resulted from the defendant's use of the books on cross-examination. *See also* Hemminghaus v. Ferguson, supra.

■ The use of Bacon's article in the case *sub judice* was proper in view of the use of Shakelford's article on cross-examination of Dr. Clements.

## DENIAL OF RIGHT TO CALL WITNESS

On the fourth day of trial all of the defendants in the case proposed, in chambers, to call as a witness in their case in chief, Dr. S. W. Rente, the radiologist at Tucson General Hospital who took barium x-rays of Zimbelman prior to the operation in question. Defendants' offer of proof was that if Dr. Rente were allowed to testify he would state that his reading of the barium x-rays would indicate that the lesion was only ten centimeters above the anal outlet and that Zimbelman's pelvis was quite narrow. This testimony would have supported Purcell's theory that it was very difficult for him to restore continuity of the bowel within the abdomen because there was not enough cuff left in the lower end of the bowel and because he was working in a barrel-shaped pelvis.

Zimbelman objected to the admission of this testimony on the grounds that the defendants have failed to provide Dr. Rente's name in their answers to interrogatories and had not raised the matter of his testimony until the fourth and last day of trial. The court, in sustaining Zimbelman's objection, noted that up to that time both plaintiff and defendants had tried the case on the theory that the lesion was seventeen centimeters above the anus and that the testimony of Dr. Rente would be a marked departure on one of the most vital issues in the case. The trial court further stated that Zimbelman should have been given notice of the defendants' intention to call Dr. Rente so that he could have instituted discovery procedures and had an opportunity to obtain other expert testimony which might put the problem in a different light.

The x-rays to which Dr. Rente was going to address himself were in evidence and the trial court did not in any way prevent the use of these x-rays by any of the other medical witnesses. Defendants offered no explanation as to why Dr. Rente was not named as a possible witness in the answers to interrogatories. The hospital argues in its brief that Dr. Rente's testimony was "critical in establishing Dr. Purcell's credibility . . . ." If such was the case, we are unable to understand why Dr. Rente's testimony was not discovered by the defendants and made available to the plaintiff prior to the final day of trial. The trial court did not abuse its discretion in refusing to allow this witness to testify. Carver v. Salt River Valley Water Users' Ass'n, 104 Ariz. 513, 456 P.2d 371 (1969).

## ERRORS IN INSTRUCTIONS

Dr. Purcell objected to the trial court giving Instruction No. 13 concerning the doctrine of error of judgment. Purcell objected to the instruction on the grounds that " . . . it is a misstatement of the law since the actual test of 'error of judgment' as a defense, is stated in the requested instructions of the Tucson General Hospital, namely Instructions Nos. 1 and 2, . . . furthermore, . . . Instruction No. 13 states too strict a duty on physicians .. . . ." The hospital's Instructions 1 and 2 were given by the court. A complaint that an instruction is not a correct statement of law does not constitute a distinct statement of grounds for objection within the purview of Rule 51(a), Ariz.R.Civ.P., 16 A.R.S., and is insufficient. Tanner v. Pacioni, 3 Ariz.App. 297, 413 P.2d 863 (1966). Rule 51(a) states:

"No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

The objection that the instruction "states too strict a duty on physicians" is as nebulous as the objection that the instruction constitutes a misstatement of the law. The purpose of Rule 51(a), supra, is to apprise both the trial court and the party offering the instruction of the exact nature of the objection so that the court can intelligently rule thereon, eliminate objectionable matter, and word the instruction in a manner which might be agreeable to all parties. Instruction No. 13 which was given as requested is as follows:

"You are instructed that the defense of 'error in judgment' is available to the Defendant Purcell only under the following circumstances:

1. Only if Defendant Purcell used ordinary and reasonable care to make those diagnostic tests and procedures which would have been made by the average, competent surgeon so that his judgment could be exercised upon an intelligent knowledge of the patient's condition; and

2. Only if there were alternative procedures available, and all of such alternatives were recognized as proper procedures for Plaintiff's condition.

Under such circumstances if Defendant, in his judgment, followed the recognized, proper alternative which he thought best under the circumstances he would not be negligent."

What part of this instruction states "too strict a duty on physicians?" For the first time on appeal, Purcell sets forth with particularity his objection to the instruction. However, having failed to do this in the trial court, he has precluded appellate review. Purcell has set forth other instructions as being erroneously denied. We have examined them and find that either they contained an incomplete statement of the law or that they are adequately covered by other instructions.

Affirmed.

KRUCKER, C. J., and HATHAWAY, J., concur.