Rose Marie Wheeler v. Central Vermont Medical Center, Inc. and Medical Staff of Central Vermont Hospital

[582 A.2d 165]

No. 88-050

Present: Allen, C.J., Peck[1] and Dooley, JJ., and Barney, C.J. (Ret.) and Keyser, J. (Ret.), Specially Assigned

Opinion Filed October 27, 1989

Defendant's Motion for Reargument Denied January 4, 1990; Plaintiff's Motion for Reargument Denied August 14, 1990.

---

[1] Justice Peck sat at argument but did not participate in the decision.

*William H. Meub* and *Timothy L. Taylor* of *Kelley, Meub, Powers & English, Ltd.*, Middlebury, for Plaintiff-Appellee.

*Allan R. Keyes* of *Ryan Smith & Carbine, Ltd.,* Rutland, for Defendant-Appellant.

**Allen, C.J.** Defendant Hospital corporation appeals from a judgment entered on a jury verdict awarding plaintiff compensatory and punitive damages for negligently granting privileges to a surgeon who performed unsuccessful surgery on her, with resultant injuries. We affirm the judgment on liability and compensatory damages and reverse the award of punitive damages.

Plaintiff alleged that in March 1981 Dr. Arthur Wright performed a gastroplasty (a weight-reduction operation also known as "stomach stapling") and then failed to treat her properly, though alerted to numerous postoperative symptoms, including persistent vomiting, malnutrition, and coma. Dr. Wright was not an employee of the Hospital, and the theory of liability was based on "corporate negligence" in allowing an incompetent physician to practice medicine and perform surgery within the Hospital.

In a bifurcated trial, the jury first found that Dr. Wright had committed malpractice. The second part of the trial was devoted to plaintiff's claim that the Hospital was negligent in allowing Dr. Wright to have unlimited privileges at the Hospital, despite what plaintiff called abundant evidence that his professional competency did not merit such trust. Underlying plaintiff's theory of liability was the argument that peers and staff were aware of Dr. Wright's record prior to the operation on plaintiff and in fact that Dr. Wright was forced to resign as chief of surgery in March 1980. Plaintiff sought to prove that despite the existence of a Hospital peer-review system, the evident purpose of which was to uncover and rectify incompetence among those with Hospital privileges, the Hospital Board of Trustees (Board) was never notified, and no steps were taken to limit Dr. Wright's surgical practice at the Hospital prior to the operation on plaintiff.

Plaintiff attempted through discovery to obtain peer-review materials from defendant to show what it knew about Dr. Wright, but defendant at all times asserted, and the trial court upheld, that the so-called peer-review privilege under 26 V.S.A.

§§ 1441–1443 prevented disclosure.[2] Hospital trustees had testified that they never had heard anything that would have caused them to question Dr. Wright's competence.

Plaintiff then presented testimony aimed at establishing a record of certain of Dr. Wright's previous cases involving failures of diagnosis, improper treatment, and incompetent surgery. Thereafter, Dr. John Porterfield, an expert on hospital accreditation, testified on how the peer-review process was supposed to work. Based on the earlier testimony regarding Dr. Wright's record at the Hospital, he testified that in his opinion a hospital administrator and a peer-review committee should have acted in these particular circumstances. He opined that Dr. Wright's privileges should have been suspended and information about his record transmitted to the Hospital trustees.

Defendant sought to ask Dr. Porterfield whether certain information contained in peer-review material made available to him undercut his opinion since it did indicate that the medical staff had begun an evaluation of Dr. Wright's cases. Defendant wanted to show that, contrary to the impression created by Dr. Porterfield, Dr. Wright's case had been under continuous review by the medical staff, beginning in 1980. The court barred cross-examination based on use of peer-review records.

## I.

On appeal defendant argues that this line of questioning

---

[2] 26 V.S.A. § 1443 states:

The proceedings, reports and records of committees defined in section 1441 of this title shall be confidential and privileged, and shall not be subject to discovery or introduction into evidence in any civil action against a provider of professional health services arising out of the matters which are subject to evaluation and review by such committee, and no person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such civil action as to any findings, recommendations, evaluations, opinions, or other actions of such committees or any members thereof. However, information, documents, or records otherwise available from original sources are not to be construed as immune from discovery or use in any such action merely because they were presented during the proceedings of such committee, nor shall any person who testifies before such committee or who is a member of such committee be prevented from testifying as to matters within his knowledge, but such witness shall not be asked about his testimony before such committee or about opinions formed by him as a result of such committee hearings.

should have been permitted because Dr. Porterfield's testimony "left the clear impression that nothing had been done by the peer review committees." Defendant, early in the trial, objected to plaintiff's attempt to use peer-review material to demonstrate that the Hospital knew about Dr. Wright's history and that its trustees, officers, and staff failed to react prudently to that knowledge. It was the parties' apparent understanding that the Hospital could have waived the peer-review privilege and used the materials to counter plaintiff's attempt to demonstrate a failed peer-review process. That assumption may or may not be correct under our statute[3]—an issue not briefed or argued to this Court and not decided herein.

But as viewed by the parties, the issue raised by the attempted use of peer-review materials by defendant in cross-examination is one of whether plaintiff's examination of Dr. Porterfield referred to peer-review materials in violation of the statutory prohibition and the ground rules established by the court early in the trial and assented to by both sides. Defendant argues first that in arriving at his opinions and conclusions, Dr. Porterfield relied on three documents marked as exhibits which

---

[3] A strong argument could be made that the Hospital was not empowered to waive the peer-review privilege, since 26 V.S.A. § 1443 does more than provide a privilege, but arguably announces a mandatory policy against disclosure. The section provides that "no person who was in attendance at a meeting of such [peer-review] committee shall *be permitted* or required to testify in any such civil action." (Emphasis added.) In *West Covina Hospital v. Superior Court*, 41 Cal. 3d 846, 718 P.2d 119, 226 Cal. Rptr. 132 (1986), a peer-review committee member was allowed to testify voluntarily, over objections, and the trial court decision was affirmed. The California Supreme Court noted that the statute stated that "no person in attendance at a meeting of any of those [peer-review] committees shall be *required* to testify as to what transpired at that meeting." *Id.* at 850, 718 P.2d at 121, 226 Cal. Rptr. at 132–33. (Emphasis added.) The language "no person . . . shall be permitted" was absent. Three justices dissented on grounds that the majority decision undermined the purpose of the protections offered by the statute.

At least one commentator has noted the distinction between statutes affirmatively barring peer-review testimony and has suggested that language like Vermont's might be read to preclude the use of peer-review evidence. See Comment, *The Medical Review Committee Privilege: A Jurisdictional Survey*, 67 N.C.L. Rev. 179, 186 (1988).

Some peer-review statutes expressly provide for waiver, e.g., Ind. Code § 34-4-12.6-2(c) (1986), allowing "prior waiver[s] executed by the committee."

"contain peer review material," a deposition of a physician at the Hospital, an affidavit "referring to remedial steps the hospital took in 1980 and 1981," according to defendant, and the minutes of a medical staff executive committee meeting. Defendant then concludes that it should have been given "the opportunity to impeach the doctor's opinion by disclosing the remedial action in fact taken by the hospital as set forth in these documents relied on by Dr. Porterfield." Other than stating that certain exhibits tainted with peer-review information were known to Dr. Porterfield, defendant offers no support for the proposition that the witness' testimony relied on or made any wayward reference to peer-review materials. He did not testify that based on his familiarity with peer-review records he knew that the Hospital had not taken prudent steps. His testimony was limited to what the Hospital should have done, based on his expertise in the field and knowledge of the several specific treatment records reflecting negatively on Dr. Wright's competency.

■ Nor may defendant argue that Dr. Porterfield's mere awareness of the peer-review materials ripened into fruit of the poisonous tree, influencing his testimony to the detriment of defendant, whether or not the source of his opinion was revealed to the jury. Dr. Porterfield testified only as to matters whose existence and verifiability did not depend in the slightest on peer-review materials. As one commentator has characterized such evidence with respect to the purposes for which the peer-review privilege exists:

> Thus, if the information sought in discovery is independently replicable or of the type whose existence is assured and that is independently verifiable, one of the privilege's essential criteria is not met: permitting discovery will not curtail the flow of important information. In contrast, the quality of factual data that are neither independently replicable nor verifiable could be adversely affected by discovery.

Note, *The Privilege of Self-Critical Analysis*, 96 Harv. L. Rev. 1083, 1095 (1983). The commentator adds: "Neither should factual materials that are otherwise discoverable be protected

merely because they also happen to be contained in a critical self-analysis." *Id.* at 1096 n.46. The text of 26 V.S.A. § 1443 makes the same distinction. See *O'Connor v. Chrysler Corp.*, 86 F.R.D. 211, 218 (D. Mass. 1980) (sex discrimination guidelines); *Rosario v. New York Times*, 84 F.R.D. 626, 631 (S.D.N.Y. 1979) (racial discrimination in employment); Flanagan, *Rejecting a General Privilege for Self-Critical Analyses*, 51 Geo. Wash. L. Rev. 551, 556 (1983) (affirmative action). Dr. Porterfield's testimony as to what should have been done by the medical staff established nothing more than an objective standard of conduct. It was not offered as proof of what was or was not done by defendant's trustees, officers, or staff. We agree that it was aimed at allowing the jury to conclude that nothing had in fact been done, but other than noting Dr. Wright's obvious continued presence at the Hospital as a surgeon with operating privileges after the date that plaintiff's expert opined that the Hospital should have taken corrective action, plaintiff introduced no evidence as to what the Hospital in fact did concerning his continued presence there and certainly no evidence derived from peer-review materials.

Defendant contends that the present case is similar to *State v. Messier*, 146 Vt. 145, 499 A.2d 32 (1985), where the trial court allowed the State to introduce suppressed evidence, otherwise inadmissible, to rebut inferences resulting from the use of selected parts of the suppressed evidence by the defendant. *Id.* at 152–53, 499 A.2d at 38. The difference between *Messier* and the present case is that here plaintiff introduced no proscribed evidence. To argue that the evidence offered by Dr. Porterfield was tainted, like the suppressed evidence used by the defendant in *Messier*, is to argue that plaintiff should not have been able to present any case whatsoever.

## II.

### A.

Defendant next argues that the trial court erred in allowing the jury to consider "future damages" because plaintiff's expert witnesses did not present sufficient evidence to justify such damages and that in any case the jury instruction on the

issue was erroneous. The relevant portion of the jury instruction on permanent damages was as follows:

> [A]ny permanent injury that the Plaintiff suffered as a result of the Defendant's negligence in awarding damages for a permanent injury. You should consider all the evidence you think is believable about the Plaintiff's health, activities, age and life expectancy.
>
> . . . .
>
> . . . In awarding damages you must bear in mind that the Plaintiff may recover only for injuries that were proximately caused, as I have defined it, by the defendant's negligence and not for a physical or mental condition that would have occurred regardless of whether the actions or inactions of the hospital and of Dr. Wright had happened.

■■ Competent expert medical evidence must exist on the record for the jury to reach a verdict that includes permanent damages. *Howley v. Kantor*, 105 Vt. 128, 133, 163 A. 628, 631 (1933). Defendant centers its attention on the testimony of only one of plaintiff's witnesses, Dr. Richard Gamelli, whose testimony on permanent damages could be fairly described as inconclusive, due in large part to the absence of what the witness considered adequate baseline information about the condition of plaintiff before her operation. As to this testimony defendant correctly relies on our holding in *Howley v. Kantor* that conjectural and speculative evidence is inadequate to support a claim for damages. The medical witness in that case had testified as to a possibly cancerous lump, stating that "what it is at this stage is pure speculation." In the present case, in addition to Dr. Gamelli's testimony, there was other competent medical testimony that the plaintiff had sustained permanent neurological and psychological damage. It was significant that the instruction stressed the importance of proximate cause, cautioning the jury not to consider physical or mental conditions that would have occurred irrespective of the actions or inactions of Dr. Wright or of defendant Hospital. The trial court did not err in submitting the issue of permanency to the jury.

## B.

■ In its reply brief defendant argues that the court erred in failing to direct a verdict in its favor on the issue of future damage, because defendant "distinctly informed the court that the evidence of future damage was insufficient to support a verdict and that such damage must be proved by a reasonable degree of medical certainty." In further explaining its claim of error defendant significantly narrows the scope of its assertion, arguing that "[p]laintiff has made no claim before this Court that there was any evidence of injury to Plaintiff's liver, kidney, heart, lungs, bones, etc. sufficient to submit *these elements of future damage* to the jury." (Emphasis supplied.) Defendant, however, does not argue that there was no evidence of both permanent neurological and psychological damage, and, significantly, its motion for directed verdict addressed only the testimony of Dr. Gamelli. So long as there was some evidence supporting permanent damage, denial of the motion for directed verdict was proper. As we stated in *Kinzer v. Degler Corp.*, 145 Vt. 410, 491 A.2d 1017 (1985):

> In passing upon the propriety of the granting of a motion for judgment n.o.v., V.R.C.P. 50(b), we must view the evidence in the light most favorable to the nonmoving party, excluding the effect of any modifying evidence. The question is whether the result reached by the jury is sound in law on the evidence produced.

*Id.* at 412, 491 A.2d at 1018. Defendant's motion attempted to eliminate the issue of permanent damage without addressing all of the evidence that might have supported such claim of damage. The court was correct in denying the motion for directed verdict.

## C.

■ Defendant also contends that the jury instruction established the incorrect standard, because it failed to charge the jury that plaintiff must prove damages using the phrase "by a reasonable degree of medical certainty." The instruction on burden of proof was stated as follows:

> The plaintiff has the burden of proof to prove the elements of her case by a preponderance of the evidence. In other words, for the Plaintiff to prevail on an issue, she must persuade you that the evidence in support of her claim on that issue is more nearly correct than the Defendant's evidence. To put it another way, if you find that Plaintiff's claim on an issue is more likely true than not, then the Plaintiff has prevailed on that issue. On the other hand, if you decide that Plaintiff's claim on an issue is more likely false than true, or you cannot decide one way or the other, then the Plaintiff has not met her burden of proof and your decision on that claim must be in favor of the Defendant.

Defendant does not explain why this instruction, which is a classic rendering of the preponderance-of-evidence standard that governs most issues in civil litigation, see, e.g., *Lyndonville Savings Bank & Trust Co. v. Peerless Insurance Co.*, 126 Vt. 436, 441, 234 A.2d 340, 343 (1967); *Neverett v. Towne*, 123 Vt. 45, 48, 179 A.2d 583, 585 (1962), is in error or what authority commands a higher standard, such as proof by clear and convincing evidence. At most, the language proffered by defendant is a variant of the preponderance standard and not a higher standard at all. While "reasonable degree of certainty" contains the word "certainty," which might connote some marginally higher standard of proof than a mere preponderance, the modifier "reasonable" returns the standard to the level of preponderance. In short, what defendant sought was language that might have suggested some higher standard to the jury as a matter of verbal harmonics, but as a matter of law it was not required or supported by any Vermont precedent.

## III.

Defendant next argues that the trial court erred in dismissing a juror who was empaneled without objection, even though she was the mother of Dr. George Lucchina, who had been chairman of the Hospital's department of medicine in 1981 and who had since died, and even though she was acquainted with a potential witness in the case. During the trial plaintiff offered testimony that it was "inappropriate" for Dr. Wright's surgical

privileges to have been approved by the department of medicine, and in rebuttal defendant offered evidence that privileges of all members of the department of surgery were approved by Dr. Lucchina as chief of medicine. When Dr. Lucchina's name was mentioned, the juror "became emotional," and plaintiff moved to disqualify her, arguing that she would have been challenged for cause had plaintiff recognized Dr. Lucchina's signature on the 1981 reappointment document. The trial court granted the motion without allowing defendant a voir dire to determine if the juror could properly continue to sit.[4]

■■■■ Plaintiff mistakenly suggests, without support in the record, that a voir dire of this juror was not feasible, citing *State v. Shields*, 15 Ohio App. 3d 112, 472 N.E.2d 1110 (1984). Defendant correctly argues that a juror should be disqualified only if the juror, under examination, exhibits a state of mind showing a fixed opinion, bias, or prejudice. *Jones v. Shea*, 148 Vt. 307, 309, 532 A.2d 571, 573 (1987). However, the trial court did not err in granting the motion. The standard for determining bias that evolves from the events of a trial must accord great discretion to a trial judge. In addition to the theoretical factors that could be brought to light in a pretrial voir dire, the trial itself is a continuous and dynamic environment in which the actual reactions of jurors to the business of the trial may be weighed. Though such events are fortunately rare, when a juror's strong emotional reaction to the proceedings becomes clear mid-trial, based on subjective personal factors connecting her to the subject matter before her, the judge's observations can be as critical to a disqualification decision as the words of the juror herself. While a voir dire in such circumstances is still advisable, in the absence of a strong and clear demonstration of prejudice to the party objecting to removal, we will not question the discretion of the trial court. See *State v. Kelly*, 131 Vt. 358, 360–61, 306 A.2d 89, 90 (1973); *State v. Haislip*, 237 Kan. 461, 469, 701 P.2d 909, 917–18, *cert. denied*, 474 U.S. 1022 (1985).

---

[4] Because of a stipulation that as few as nine jurors could make up the panel, there was no issue as to the total number of jurors.

## IV.

██ ██ Finally, we agree with defendant that plaintiff's evidence was insufficient to support an award of punitive damages because she was unable to demonstrate malice.[5] Malice can be proven by direct evidence of defendant's mental state and may be inferred from the nature of his conduct and the surrounding circumstances. *Shortle v. Central Vermont Public Service Corp.*, 137 Vt. 32, 33, 399 A.2d 517, 518 (1979). The trial judge gave no indication that direct evidence supported the potential for malice. The trial court allowed the punitive damage issue to go to the jury because "an argument can be made that so little was done by the Board of Trustees and by the hierarchy of the Hospital to monitor doctors, that it amounts to a callous disregard of patients' rights." Plaintiff urges that though the Hospital trustees were uninformed about the numerous cases of alleged malpractice involving Dr. Wright, the trustees were ultimately responsible for management of the Hospital, including management of a system that permitted the forced resignation of the chief of surgery without their knowledge or involvement. We agree. *Darling v. Charleston Community Memorial Hospital*, 33 Ill. 2d 326, 332, 211 N.E.2d 253, 257 (1965), *cert. denied*, 383 U.S. 946 (1966); *Johnson v. Misericordia Community Hospital*, 99 Wis. 2d 708, 723, 301 N.W.2d 156, 170–71 (1981); *Purcell v. Zimbelman*, 18 Ariz. App. 75, 80–81, 500 P.2d 335, 341 (1972). The Board's delegation of the function of physical performance review to a self-governing medical staff cannot permanently insulate the Board from the malice or the equivalent of malice exhibited by the medical staff. Nor do we agree with defendant that, without evidence of what the peer-review committee did or did not do, it is virtually impossible to demonstrate malice. However, the record contains no evidence of "conduct manifesting personal ill will or carried out under circumstances evidencing insult or oppression, or . . . a reckless or

---

[5] In the past we have described the malice necessary to support an award of punitive damages as "actual malice." In the interest of uniform usage, we now avoid this term in the context of punitive damages. *Ryan v. Herald Association, Inc.*, 152 Vt. 275, 281 n.5, 566 A.2d 1316, 1320 n.5 (1989).

wanton disregard of one's rights." *Shortle*, 137 Vt. at 33, 399 A.2d at 518. While reckless and wanton disregard may be the functional equivalent of malice in Vermont, a party seeking to demonstrate behavior which goes beyond negligence to recklessness should offer some testimony that the Hospital operated so far below the norm as to allow the inference of insult, oppression, recklessness, or wantonness, to paraphrase *Shortle*. That line is a hard one for a lay jury and even for a court to perceive, and the subject deserved plaintiff's specific attention, which it did not receive.

*The judgment on liability and compensatory damages is affirmed. The award of punitive damages is reversed.*

**Dooley, J.**, concurring. I concur in the result and the analysis of the majority. I write here only to add that the trial court's holding that the peer-review privilege, 26 V.S.A. § 1443, barred the introduction of evidence on action or inaction in the peer-review committee was not appealed and is not before us. There are, I believe, significant reasons to believe that this ruling was wrong and that it extended the reach of § 1443 far beyond its intended scope. It was, however, the defendant Hospital corporation which invoked the privilege and created the untenable situation where it could not prove the actions it took as a result of the peer-review to defend against plaintiff's claim. Its tactical decision, and not improper testimony by Dr. Porterfield, was the real source of its problems before the jury. We should not intervene when its tactical decision proved unwise.