Kristi L. **STRUBHART, Personal Representative of the Estate of Geoffrey B. Tearney, Deceased, Appellant,**

v.

**PERRY MEMORIAL HOSPITAL TRUST AUTHORITY, Appellee.**

No. 73929.

Supreme Court of Oklahoma.

Feb. 14, 1995.

Partial Concurrence and Dissent by Justice Simms Changed Feb. 23, 1995.

Rehearing Denied Sept. 20, 1995.

required to bear its proportionate share of transportation costs when the sale occurs off the lease premises.

George D. Davis, Connie M. Bryan, McKinney, Stringer Webster, P.C., Oklahoma City, for appellant.

Page Dobson, Charles F. Alden III, Julie Trout Lombardi, Holloway, Dobson, Hudson & Bachman, Oklahoma City, for appellee.

LAVENDER, Justice.

A jury verdict was returned in favor of appellant, Kristi L. Strubhart (hereafter plaintiff), personal representative of the estate of Geoffrey B. Tearney (Geoffrey), deceased and against appellee, Perry Memorial Hospital Trust Authority (hospital) for negligence in causing Geoffrey's death. We decide whether the trial judge erred in granting a new trial to the hospital upon plaintiff's refusal to accept a remittitur. We hold that, although the trial court erred in granting hospital's alternative motion for a remittitur, we cannot say the trial court abused his discretion in ordering a new trial. We also adopt the doctrine of independent corporate responsibility to the extent this doctrine imposes a duty of ordinary care on hospitals to ensure that: 1) only competent physicians are granted staff privileges, and 2) once staff privileges are granted to a physician the hospital takes reasonable steps to ensure patient safety when it knows or should know the staff physician has engaged in a pattern of incompetent behavior. This theory of liability will be available to plaintiff on remand and retrial.

## PART I. FACTS AND PROCEDURAL HISTORY.

Gayla Tearney, mother of Geoffrey, was admitted to the hospital to give birth. Dr. Richard Seal (Dr. Seal), the attending physician, was the parents' private physician who had staff privileges at the hospital. It is undisputed that Dr. Seal was not an employee of the hospital. He only had staff privileges there, i.e. he was allowed to use the facility to treat his patients. He was, thus, an independent contractor in regard to his treatment of both Gayla and the infant Geoffrey.

Geoffrey was born about 1:30 a.m. after a difficult labor and traumatic delivery by for-

ceps. Dr. Seal stayed with the baby approximately one hour before placing the newborn in the hospital's nursery. Dr. Seal left the hospital about 3:00 a.m., leaving a third or fourth year medical student, a Sheila Kennedy, who the parties refer to as an extern medical student, in charge of Geoffrey. Nurse Jeanne Bowles, a hospital employee, was on duty in the nursery when the baby was brought there and had the immediate care of Geoffrey during the early morning hours, as Ms. Kennedy apparently had other duties to perform or spent her time in a van outside the hospital. Nurse Bowles testified she was concerned about the baby from the outset and that she had been informed by other hospital personnel about the traumatic delivery.[1] Also looking after the baby was a nurses' aid who was given the responsibility by Nurse Bowles of taking Geoffrey's vital signs every fifteen minutes.

Testimony revealed that Dr. Seal gave Nurse Bowles an order to call Kennedy first if there was a problem with the baby or before Bowles gave the baby oxygen, but if a disagreement arose between Bowles and Kennedy that could not be satisfactorily worked out that Seal be called. In view of her concern about the baby, at 3:45 a.m. Nurse Bowles called Ms. Kennedy to look at Geoffrey. Kennedy came to check on Geoffrey and told Nurse Bowles that Geoffrey was fine. At 4:00 a.m. Bowles, still concerned, contacted Kennedy again. Kennedy again checked Geoffrey and told Bowles the baby was fine. Bowles did not contact Dr. Seal during this time and she testified that after the second check by Kennedy she felt she must have been wrong in her concern for Geoffrey's condition. Testimony also revealed that the nurses' aid assigned to check Geoffrey's vital signs fell asleep twice during the night and the hospital records for the vital signs suggest vitals were not taken on two occasions.

Beginning shortly after 7:00 a.m. several other hospital employee nurses and Dr. Seal (who had returned to the hospital) cared for Geoffrey. Geoffrey was eventually transferred to a hospital in Oklahoma City in the late morning or early afternoon after it was discovered he had gone into hypovolemic shock caused by a subgaleal hematoma probably the result of an improper forceps delivery by Dr. Seal. The shock was caused by loss of blood which was the result of internal bleeding, probably from a vein, which was draining blood from the baby's body and collecting it into the space between the outer skull and overlying skin covering of his head. Geoffrey died of hypovolemic shock early in the evening at the hospital in Oklahoma City.[2]

Plaintiff also presented evidence that Nurse Bowles and other hospital employees had previous concerns about Dr. Seal's treatment of patients, including his reluctance to transfer patients to more specialized facilities when the need arose. The trial court admitted this evidence giving a limiting instruction to the jury that he was permitting its introduction "only to show what was in the mind of the nurses and hospital personnel and how it may have, if in any way, or did affect or should have affected their actions." The prior episodes included 1) two other cases where infants were not transferred to specialized facilities and death occurred, one about a week before Geoffrey's death and the other about two years prior; 2) leaving surgery or "breaking scrub" on two occasions while patients were still on the operating table, which was a violation of hospital policy[3]; 3) failure to arrive at the hospital for the delivery of a baby, requiring that a nurse

1. Nurse Bowles was not the attending nurse for the delivery.

2. Hypovolemia is an abnormally low volume of blood circulating in the body, which usually follows a severe blood loss which may occur as a result of internal bleeding. It is a dangerous condition that can lead to shock and death. AMERICAN MEDICAL ASSOCIATION ENCYCLOPEDIA OF MEDICINE 564 (1989). A subgaleal hematoma is caused by bleeding into or between the outer skull surface and the overlying skin. SLOANE–DORLAND ANNOTATED MEDICAL–LEGAL DICTIONARY 305 (West 1987) (definition of galea aponeurotica); WEBSTER'S NEW COLLEGIATE DICTIONARY (1979) (definition of hematoma); *State v. Durand*, 465 A.2d 762, 763 (R.I.1983).

3. On one of these occasions Dr. Seal went to a phone close to the operating room, called a local pharmacy and blew a whistle into the phone.

deliver the infant; 4) sending a patient home within twenty-four (24) hours with an incision into her rectum without antibiotic coverage necessitating that the patient undergo surgery to cure an infection; and 5) two times when Seal apparently failed to report suspected physical and/or sexual abuse of children situations to appropriate authorities.

The focus of plaintiff's case against the hospital was that hospital employees, particularly Nurse Bowles, were negligent in their care of the infant from approximately 3:00 a.m. until 7:00 a.m. by their omission to take proper action to obtain adequate care for Geoffrey when it was recognized Geoffrey was a severely distressed infant. Plaintiff's theory was that the baby was noticeably and severely ill during this time and that Nurse Bowles should have contacted Dr. Seal during the night, or, if Dr. Seal failed to respond to the baby's condition when contacted, that Nurse Bowles should have "gone over his head" to the director of nursing or hospital administration so that steps could be taken to transfer the infant to a neonatal care facility in Oklahoma City, Tulsa or Enid.

Two medical doctor experts for plaintiff testified that failure of the nurses to have taken such action fell below the accepted standard of care for nurses and that such failure was a direct, contributing cause of Geoffrey's death. One expert also testified that the evidence of prior knowledge or questions concerning Seal's previous treatment of patients showed that hospital personnel knew they had a problem doctor on staff and that the nurses, following accepted standard nursing practice, should have taken this information into consideration when providing care and treatment to Geoffrey. This expert also opined that the nurses' aid falling asleep was a significant factor in causing the death because of the importance of having an accurate record of the vital signs with an infant in Geoffrey's condition. Plaintiff's other expert

did not believe this was a significant factor in causing the death. Both medical experts for plaintiff were also of the view Dr. Seal's treatment of Geoffrey fell below accepted standard medical practice and was a contributing cause of the death.

Hospital's defense relied on the theory the negligence of Dr. Seal during the mother's labor, during delivery of the infant, and continuing thereafter until the baby's transfer to Oklahoma City, was the sole cause of Geoffrey's death. Hospital's experts were generally of the view that until sometime after 7:00 a.m. (after Seal had returned to the hospital) the baby's condition could not have been recognized by nurses as critical and that only when the baby "crashed" after this time was it evident that Geoffrey had gone into shock.[4] Hospital further attempted to show that hospital employees' care of Geoffrey during all times he was at the hospital did not fall below the accepted standard of nursing practice, that hospital employees reasonably followed the orders of Dr. Seal and that hospital employees had no adequate or obvious reason to contact Dr. Seal during the above critical hours or "go over his head" to seek independent care or transfer the infant to a more specialized facility. All three of hospital's experts backed up the hospital's theory of the case.

Initially, plaintiff sued the hospital, Dr. Seal, Ms. Kennedy and the Oklahoma College of Osteopathic Medicine & Surgery. Before trial plaintiff dismissed with prejudice all claims against the latter three. The plaintiff and Dr. Seal agreed to a pre-trial settlement of $150,000.00. The action proceeded to trial only against the hospital. The jury returned a verdict against hospital for $800,000.00, which the trial court reduced to $650,000.00 in light of the previous $150,000.00 settlement.[5] Hospital also filed post-trial motions for a new trial, judgment notwithstanding the verdict, or a remittitur.

---

**4.** The term "crash" has basically been used by the parties to connote a severe or drastic change for the worse in the baby's condition and vital signs.

**5.** The Judgment on the Verdict of the jury issued by the trial judge reflects that the $150,000.00 settlement was on behalf of Dr. Seal, Ms. Kennedy and the Oklahoma College of Osteopathic

Medicine & Surgery and not just in relation to Dr. Seal. The Court of Appeals' opinion in this matter reflects the settlement was only with Dr. Seal. This discrepancy is not pertinent to our decision here. Suffice it to say plaintiff does not dispute the correctness of the $150,000.00 reduction pursuant to 12 O.S.1981, § 832(H)(1).

The trial judge ordered a new trial unless plaintiff agreed to a remittitur of $500,000.00 of the $800,000.00 jury verdict, meaning the verdict against the hospital would be reduced to $150,000.00 considering the previous reduction for the settlement.

Hospital's motion for new trial was based on many grounds, including misconduct of plaintiff's counsel, erroneous admission of evidence regarding prior alleged bad acts of Dr. Seal, error in certain instructions, award of excessive damages and improper attempt of outside persons to influence the jury. The remittitur motion was on the grounds the verdict was not supported by the evidence and that the excessive, punitive and unconscionable nature of the verdict was brought about by attorney misconduct and the erroneous admission of evidence.

In his written order granting a new trial upon plaintiff's failure to remit $500,000.00 of the verdict the trial judge ruled the jury award was grossly excessive, contrary to substantial justice and that the hospital did not receive a fair trial. He also ruled that the errors claimed in hospital's motion for new trial did occur, including, but not limited to, the following:

> Much of the evidence of plaintiff was either hearsay or presented in such a way as to make it appear that the hospital was responsible for Dr. Seal's conduct which violated the earlier order of the Court to the effect that the theory of corporate negligence was not the law in Oklahoma; ....

The trial court's reference to corporate negligence concerned his earlier order dismissing from the case any theory of liability against the hospital based on the hospital's independent duty to supervise or recommend some action be taken against an allegedly incompetent physician with staff privileges at the hospital, even though the physician is not an employee of the hospital, i.e. the physician is an independent contractor. In recent years other jurisdictions deciding the question have virtually unanimously adopted some form of this theory, variously called corporate negligence, corporate responsibility or corporate liability, based on an independent duty of the institution itself owed directly to patients to ensure their safety and welfare while in the confines of the hospital. *See e.g. Oehler v. Humana, Inc.,* 105 Nev. 348, 775 P.2d 1271 (1989); *Insinga v. LaBella,* 543 So.2d 209 (Fla.1989); *Blanton v. Moses H. Cone Memorial Hospital, Inc.,* 319 N.C. 372, 354 S.E.2d 455 (1987); *Pedroza v. Bryant,* 101 Wash.2d 226, 677 P.2d 166 (1984); *Tucson Medical Center, Inc. v. Misevch,* 113 Ariz. 34, 545 P.2d 958 (1976). The Court of Appeals decided plaintiff failed to preserve in the petition in error the issue of whether Oklahoma recognizes such a theory of liability against a hospital and, therefore, did not decide the issue.

In addition to his written order the trial court made certain remarks at the hearing on hospital's motion which seem to show he misunderstood the role of a remittitur. He said in pertinent part:

> We all know, in any negligence or malpractice case, basic issues are liability—and if there is liability, what are the damages. As far as damages are concerned, if liability is proven, the death of the child would justify the award that the jury gave in this case.
>
> However, when you look at the liability issue and the weakness of the Plaintiff's case as far as liability is concerned, I have the initial feelings that the damages awarded in this case were excessive and that a remittitur may be in order.

Plaintiff appealed these rulings of the trial court and the Court of Appeals, Division 2, affirmed in a 2–1 decision. Plaintiff then sought certiorari which we previously granted.

## PART II. STANDARD OF REVIEW.

## PART II(A). NEW TRIAL.

A trial court has wide discretion in granting a new trial. *Austin v. Cockings,* 871 P.2d 33, 34 (Okla.1994). Normally, an appellate court will indulge every presumption in favor of the correctness of the ruling of the trial judge in sustaining a motion for new trial and such order will not be reversed on appeal unless the record clearly shows the trial court erred on a pure and unmixed question of law, or acted arbitrarily or capriciously. *Id.* Further, when the new trial is

granted by the same judge who tried the case, a much stronger showing of error or abuse of discretion is required than if the party was appealing a refusal to grant a new trial. *Fitts v. Standard Life and Accident Insurance Co.*, 522 P.2d 1040, 1043 (Okla. 1974).[6] Thus, a decision to grant a new trial will not be reversed unless it is shown beyond all reasonable doubt the trial court materially and manifestly erred. *Id.*

Although the above standard is a strict one, a trial court's exercise of discretion must be a sound legal discretion in accordance with recognized principles of law, rather than an exercise of arbitrary discretion exercised at will. *Dodson v. Henderson Properties, Inc.*, 708 P.2d 1064, 1065 (Okla. 1985). Furthermore, where the issues raised necessitate an examination of the entire lower court record, we will examine such record to determine if the trial court, in granting the new trial, abused his discretion, acted arbitrarily, or erred on some unmixed question of law. *Hansen v. Cunningham*, 285 P.2d 432, 435 (Okla.1955). It is further the rule that a trial court may not merely substitute his or her judgment for that of the jury [*Dodson, supra*, 708 P.2d at 1065] and on review an order granting a new trial will be reversed where it is based, to the exclusion of all others, on a wrong, incorrect or insufficient reason or ground and there appears no tangible, substantial, or reasonably certain basis for concluding that if the matter were tried again the result would be different. *Aldridge v. Patterson*, 276 P.2d 202, *First Syllabus* (Okla.1954). Thus, if we can say with certainty the basis of the trial court's ruling did not, contrary to the trial court's opinion, constitute prejudice the order granting the new trial should be reversed. *See Draper v. Lack*, 339 P.2d 784, 787 (Okla.1959).

## PART II(B). REMITTITUR.

The general rule is that the issue of damages in a personal injury action is left to the jury after hearing all the evidence. *Dodson, supra*, 708 P.2d at 1066. A verdict of a jury cannot be set aside as excessive unless it strikes mankind, at first blush, as beyond all measure unreasonable and outrageous and such as manifestly shows it was actuated by passion, prejudice, partiality or corruption. *Austin Bridge Company v. Christian*, 446 P.2d 46, 48 (Okla.1968). Clearly, a remittitur may be granted for an error in the admission of testimony or for the giving of an erroneous instruction, but only so long as such errors affect the question of damages and not solely that of liability. *See Remittitur, Additur, and Partial New Trial*, 6 Okla.L.Rev. 337, 338 (1953). Finally, as with a motion for new trial, the granting of a remittitur by a trial court may be reversed for an abuse of discretion or because the trial court acted arbitrarily or capriciously. *See Wells v. Max T. Morgan Co.*, 205 Okla. 166, 236 P.2d 488, 490–491 (1951).

## PART III. REMITTITUR WAS IMPROPER.

As noted, the jury verdict here was for $800,000.00 for the death of a newborn infant. As can further be seen from the comments of the trial judge at the hearing on hospital's post-trial motions, he clearly appeared to recognize that such an amount of damages was justified for the wrongful death of a child. The trial court's view merely seemed to be that because he felt the issue of the hospital's liability was weak, and errors occurred which pertained to the issue of liability, this somehow made it appropriate to grant a remittitur based on a conclusion the jury verdict was excessive. We believe such a conclusion on the trial court's part was error as a matter of law because: 1) the issues of liability and damages in a personal injury tort case are separate issues, and 2) the amount of the verdict here can in no way be considered excessive.

First off, nothing about the amount of the verdict strikes us as being outrageous or wholly unreasonable for the wrongful death of a child nor did the trial court indicate this was the case. Further, hospital

---

**6.** It has been held the reason behind a stronger showing to reverse the grant of a new trial, as opposed to the denial of such a motion, is based on the view the granting of the new trial merely places the parties in the position of having to try the issues again. *Horn v. Sturm*, 408 P.2d 541, 546 (Okla.1965).

makes no convincing argument that $800,-000.00 for the death of a newborn child is outrageous or wholly unreasonable. The only assertions of the hospital in regard to its remittitur motion which we can discern from reviewing its arguments both here and in the trial court, are that errors which may have affected a finding of liability against the hospital resulted in an unfair or excessive jury verdict. Errors associated solely with the liability issues in a personal injury or wrongful death case may not be used to support a remittitur because a remittitur is incapable of curing errors associated solely with the liability issues. Accordingly, we believe the trial court abused his discretion in granting a remittitur and the record here shows such action on his part was erroneous.

## PART IV. THE GRANT OF A NEW TRIAL TO HOSPITAL WAS APPROPRIATE.

The hospital raised six issues in its brief in support of its post-trial motions. These were 1) admission of evidence of Dr. Seal's prior conduct which hospital asserted related to corporate negligence was improperly admitted; 2) certain prejudicial remarks or conduct of plaintiff's counsel; 3) error in giving instruction No. 17 on the doctrine of lost chance and instruction No. 9, which hospital asserted allowed the jury to find liability without a finding of negligence; 4) the jury was improperly influenced outside the courtroom; 5) the verdict was not sustained by sufficient evidence; and 6) the damages were excessive. We find it necessary to review only the first of these issues because we believe the trial court cannot be said to have erred on some pure unmixed question of law, abused his discretion or acted arbitrarily or capriciously, in finally deciding the hospital was deprived of a fair trial by the admission of some or all of the evidence concerning Dr. Seal's allegedly prior bad acts.

■ Under our prior cases, a hospital receives patients under an implied obligation that it, through its personnel, will exercise ordinary care and attention for their safety, and such degree of care and attention should be in proportion to the physical and mental ailments of the patient. *Rogers v. Baptist*

*General Convention, Etc.,* 651 P.2d 672, 674 f.n. 1 (Okla.1982); *Tulsa Hospital Association v. Juby,* 73 Okla. 243, 175 P. 519 (1918). Generally, where a nurse follows the instructions or orders given her by the attending private physician, we have refused to hold her or her hospital employer liable for resulting injuries. *Van Cleave v. Irby,* 204 Okla. 689, 233 P.2d 963, 965 (1951). Further, although we have not directly so held, it has been held that nurses have a duty to the patients admitted to the hospitals where they are employed to take appropriate action for the well-being of their patients any time it is obvious an independent contractor physician is providing negligent or incompetent treatment that falls below acceptable medical standards or has given an order to the nurse that is so obviously negligent as to lead any reasonable person to anticipate that substantial injury would result to the patient by carrying out or following the order. *See e.g. Blanton v. Moses H. Cone Memorial Hospital, Inc., supra,* 354 S.E.2d at 458.

■ Here, plaintiff's case primarily boiled down to the view Nurse Bowles should have known of the obvious incompetent treatment of Dr. Seal and should have taken some action to remedy the situation. The experts were in sharp disagreement over whether a competent nurse would have questioned Dr. Seal's actions regarding Geoffrey or whether any inaction on Nurse Bowles's part, or any other hospital personnel, in not "going over his head" to seek out treatment for Geoffrey, exhibited negligent conduct. To overcome this sharp disagreement the record before us seems to show plaintiff spent an overwhelming amount of time honing in on the previous actions or inactions of Dr. Seal in other unrelated cases.

One of the hospital's main contentions in support of their new trial motion was that either the evidence of Dr. Seal's prior conduct was irrelevant to the issue of the hospital's liability in regard to Geoffrey's death, or, if relevant, its probative value was outweighed by its prejudicial effect and it should have been excluded under 12 O.S.1991,

§ 2403.[7] At trial, however, plaintiff convinced the trial court that this evidence was admissible under 12 O.S.1991, § 2404(B)[8] to show knowledge by hospital staff persons of Dr. Seal's prior inattentive care toward patients and that such knowledge and/or concern by hospital staff was merely one circumstance hospital personnel should have considered when affording treatment to Geoffrey in the exercise of ordinary care or in deciding whether to go over Dr. Seal's head.[9] Rather than one circumstance of many, a review of the record reveals, it was treated by plaintiff throughout examination of witnesses as the main circumstance hospital personnel should have considered.[10]

Faced with his observations of the trial and having heard all the evidence, the trial judge, at the post-trial stage, reconsidered his earlier admission of this evidence and was of the view that the overwhelming nature of this testimony made it appear to the jury that the hospital was responsible for the actions of Dr. Seal or, as we interpret the record, made the hospital responsible for insuring some action be taken by hospital personnel to prevent his treatment of the infant. In our view, we cannot say the trial court erred in such a view and, furthermore, it is our conclusion some of this evidence was clearly inadmissible and prejudiced the hos-

pital and, as the trial court ultimately decided, deprived the hospital of a fair trial.

In *Gutierrez–Rodriguez v. Cartagena*, 882 F.2d 553 (1st Cir.1989), the United States Court of Appeals for the First Circuit had before it the question of whether evidence of prior complaints against a police officer were admissible, not to show the tendencies of the defendant, but to show his supervisors had knowledge of his poor performance record. A two-part test was devised to answer the question: 1) was the evidence of prior bad acts introduced for a legitimate purpose, and 2) should the evidence have been suppressed because of substantial prejudice? *Id.* at 572. We have further held that as the reviewing court, we will not overturn a trial court's ruling under the balancing test of § 2403 unless there is clear abuse of discretion. *See Gabus v. Harvey*, 678 P.2d 253, 256 (Okla. 1984); *See also Jones v. Stemco Mfg. Co.*, 624 P.2d 1044, 1046 (Okla.1981) (questions of the admissibility of evidence are generally within the discretion of the trial court and will not be reversed unless an abuse is clearly made to appear).

In our view, a review of the entire record does not show a clear case of abuse by the trial judge. Some of the evidence was at most only tangentially relevant, if relevant at

7. § 2403 provides:

> Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise.

> Hospital appropriately objected at trial to the evidence of Dr. Seal's prior conduct on this same basis.

8. § 2404(B) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

9. Plaintiff also argues here, as in the trial court, the evidence of prior bad acts by Dr. Seal were admissible to support the theory of corporate negligence or responsibility we adopt in Part V(B) of this opinion. Even though plaintiff may be correct that some of the evidence may have

been admissible to support such a theory of recovery to show notice to the hospital that it had an incompetent doctor on staff and it should have taken some steps to do something about it, e.g. revoke or suspend staff privileges, supervise more closely or restrict the staff privileges to ensure patient safety, this argument affords no basis to overturn the trial court's grant of a new trial in this case. The hospital was successful in convincing the trial court to dismiss this theory from the case pre-trial. Therefore, no instructions were given to the jury on the theory nor was the hospital, thus, prepared to mount a defense to it at trial. It would, thus, be improper for us to reverse the trial court's grant of a new trial on a theory of recovery neither submitted to the jury or prepared for by the hospital.

10. This is not to say plaintiff ignored Nurse Bowles's observations of the baby during the time she spent caring for him in the nursery. Such facts and others were brought out by plaintiff at trial. However, at every turn, the record shows plaintiff's attorney rarely missed an opportunity to repeat one or more of the episodes involving Dr. Seal's conduct in these other unrelated cases in his examination of witnesses.

all, to the liability of the hospital. The most glaring example of what we believe was irrelevant evidence were the prior episodes of Dr. Seal's alleged failure to report suspected physical and/or sexual abuse of two minor patients. These episodes can hardly be said to have a bearing on whether he was a competent doctor in treating the maladies of his patients. Although no one would, of course, condone failure to report such suspected abuse, even if it was conclusively shown Dr. Seal failed to so report what **he actually thought** was child abuse, such failure on his part is so unlike the treatment involved here, and so potentially prejudicial, that we, like the trial court, question its admissibility at all. Furthermore, no evidence was presented by plaintiff that **Dr. Seal himself** suspected child abuse in either case, only that nurses suspected it. Thus, 12 O.S.1991, § 2402, which provides that relevant evidence is admissible and that irrelevant evidence is not, seems to preclude admission of these episodes. The prejudice flowing from admission of testimony concerning these purported child abuse cases is apparent to us and it was compounded by the fact plaintiff, at virtually every turn during the trial, sought to refer to them.

As to the other prior episodes, although some of them would appear to show carelessness on the part of Dr. Seal, no witness directly testified that any of the other prior episodes constituted medical mismanagement by Dr. Seal. At most one expert for plaintiff said they indicated a "problem" doctor. Even if we assume this expert was correct and that one or more of these other episodes was relevant to show what was in the minds of hospital nurses, that does not *ipso facto* lead to the conclusion the trial court erred in finally determining the probative value of admission of some or all of the evidence was not substantially outweighed by unfair prejudice.

As the facts set out in Part I of this opinion show, the main portion of plaintiff's case against the hospital centered on Nurse Bowles and her purported omissions in failing to contact Dr. Seal or "going over his head" to seek independent assistance for Geoffrey. Nurse Bowles, the main focus of

plaintiff's case, was shown to have personal knowledge of, at most, only two of the episodes, but like the child abuse testimony, plaintiff's attorney referred to all of the prior episodes throughout the trial. On this record, we simply cannot say the trial court erred in applying the balancing test required under § 2403. Clearly, the record before us does not show the trial court acted arbitrarily or capriciously or erred on a pure and unmixed question of law in finally deciding unfair prejudice outweighed any probative value of this prior episode evidence. Accordingly, the grant of a new trial to the hospital cannot be determined by us to have been error.

In that the case is remanded for retrial we do, however, think it is incumbent on us to provide guidance to the parties and the trial court on the admission of such testimony. We now do so.

As we set out in Part V(B), we impose a duty of ordinary care on hospitals to take reasonable measures to ensure patient safety when they are on notice or should be on notice they have granted staff privileges to an incompetent doctor. This potential theory of recovery is generally known as corporate negligence or responsibility. In our view, testimony about a doctor's prior conduct is admissible if the hospital, through its personnel, knows or should know with the exercise of ordinary care of the prior conduct, and the prior conduct of the doctor is such that a hospital exercising ordinary care would take some steps to either monitor or discipline the doctor. *Purcell v. Zimbelman,* 18 Ariz.App. 75, 500 P.2d 335, 343–344 (1972). Further, although we are not in a position to delineate each and every prior episode that may be admissible against a hospital to show that the hospital knew or should have known staff privileges have been granted to an incompetent doctor, such episodes or information of prior conduct might include the fact the doctor has previously been sued for malpractice (*Id.*) or experienced untoward results in prior cases. *Id.*

The admissibility of such evidence can be analogized to the situation where a person is sued for negligently entrusting an automobile to a reckless or incompetent driver and prior

reckless driving acts or proof of incompetence to drive safely is admissible to show knowledge on the part of the entrustor of the previous reckless driving conduct. *McCarley v. Durham,* 266 P.2d 629, 632 (Okla.1954); *Berg v. Bryant,* 305 P.2d 517 (Okla.1956); *See also Barger v. Mizel,* 424 P.2d 41, 46 (Okla.1967) (to hold defendant liable for entrusting a vehicle to a careless, reckless or negligent driver, a plaintiff must show defendant knew the entrustee was incompetent, careless or reckless, or in the exercise of ordinary care should have known this by the facts and circumstances existent).

■ We also note that unless the previous conduct known or which should be known by the hospital is obviously incompetent conduct that would lead a hospital exercising ordinary care to take some affirmative steps to monitor or discipline the staff physician, expert testimony will be needed to show the conduct is of a type that would lead a hospital to take appropriate precautionary steps. Expert testimony is required where the fact in issue is not within the realm of ordinary experience of mankind. *Johnson v. Misericordia Community Hospital,* 99 Wis.2d 708, 301 N.W.2d 156, 172 (1981); *See Turney v. Anspaugh,* 581 P.2d 1301, 1307–1308 (Okla.1978) (rule that expert medical testimony is required to support professional negligence case is subject to exception where negligence is so grossly apparent that layman would have no difficulty in recognizing it); *Boxberger v. Martin,* 552 P.2d 370, 373–374 (Okla.1976) (general rule is that expert testimony is ordinarily necessary to establish causation in professional liability case unless the lack of care has been such as to require only common knowledge and experience to understand and judge it).

## PART V. CORPORATE RESPONSIBILITY.

### PART V(A). ISSUE NOT WAIVED FOR APPELLATE REVIEW.

■ As noted in Part I, the Court of Appeals refused to address the issue of whether corporate responsibility is available as a theory of recovery in Oklahoma because they were of the view plaintiff failed to preserve the issue for appellate review by virtue of failure to allege in her petition in error that the trial court erred in dismissing this claim before trial. The Court of Appeals was wrong in so concluding. Although we have ruled failure to raise an issue in the petition in error is fatal to its consideration on appeal [*Kirschstein v. Haynes,* 788 P.2d 941, 955 (Okla.1990) ] we have not been overly technical in our application of this rule. *Markwell v. Whinery's Real Estate, Inc.,* 869 P.2d 840, 842 (Okla.1994). We stated in *Markwell:*

[A]lthough the specifications or assignment of error should designate the allegations of error clearly so that the court and opposing parties may ascertain the issues raised, substantial compliance is sufficient, and mere technical and formal defects should be disregarded. Rules of pleading both at the trial level and the appellate levels have been liberalized to allow courts to focus attention on substantive merits of the dispute rather than upon procedural niceties. (footnote omitted)

*Id.*

In her amended petition in error plaintiff raised the following as issue and error number 5, "[c]orporate negligence is a recognized theory of hospital liability under Oklahoma law." A party may amend their petition in error at any time before brief in chief is filed "to include any error or any issue presented to and resolved by the trial court which is supported by the record." Rule 1.17(a) of the Rules of Appellate Procedure in Civil Cases, 12 O.S.1981, Ch. 15, App. 2.[11] The above allegation in the amended petition in error was sufficient to raise the issue of the propriety of corporate negligence or responsibility in the appeal of this case. The Court of Appeals, thus, erred in failing to reach the issue and we proceed to decide it.

### PART V(B). DISCUSSION AND ADOPTION OF CORPORATE RESPONSIBILITY OR NEGLIGENCE FOR HOSPITALS.

■ A good discussion of the doctrine of independent corporate negligence or respon-

---

**11.** The current Rule 1.17(a) remains the same. 12 O.S.1991, Ch. 15, App. 2, Rule 1.17(a). We note, "[a]mendment is not required if the issues briefed are fairly comprised within the assertions of error alleged." *Markwell v. Whinery's Real Estate, Inc.,* 869 P.2d 840, 843 (Okla.1994).

sibility as it applies to hospitals is found in *Pedroza v. Bryant, supra*, where the Supreme Court of Washington adopted the doctrine. The following was said:

> The doctrine of corporate negligence appears to have been introduced in *Darling v. Charleston Community Mem. Hosp.*, 33 Ill.2d 326, 211 N.E.2d 253 (1965), where the Illinois Supreme Court found defendant hospital liable for its failure to review the plaintiff-patient's treatment and require consultation as needed. This established the concept that a hospital had an independent responsibility to patients to supervise the medical treatment provided by members of its medical staff. Liability for failure to do so was not founded on respondeat superior, which had been the traditional mode of recovery; rather, the court found the hospital liable for its own negligence and not that of the physician.
>
> The doctrine of corporate negligence has since been utilized by courts to require hospitals to exercise reasonable care to insure that the physicians selected as members of hospital medical staffs are competent. Jurisdictions adopting corporate negligence have also held that hospitals have a continuing duty to review and delineate staff privileges so that incompetent staff physicians are not retained.
>
> Before the emergence of corporate negligence, hospital liability for the negligence of a staff physician was based on the theory of respondeat superior. Plaintiffs found it difficult to recover, however, as courts tended to classify physicians as independent contractors for whose acts the hospital was not liable.....

The doctrine of corporate negligence reflects the public's perception of the modern hospital as a multifaceted health care facility responsible for the quality of medical care and treatment rendered. The community hospital has evolved into a corporate institution, assuming "the role of a comprehensive health center ultimately responsible for arranging and co-ordinating total health care." The patient treated in such a facility receives care from a number of individuals of varying capacities and is not merely treated by a physician in isolation. (some citations omitted).

677 P.2d at 168–169.

Although we have never expressly adopted the doctrine we did seem to recognize in *Weldon v. Seminole Municipal Hospital*, 709 P.2d 1058, 1061 (Okla.1985), that after a patient is admitted to a hospital without the supervision of a private doctor in attendance that a hospital in certain situations has a duty to supervise a patient's care and review a doctor's work. *See also Hillcrest Medical Center v. Wier*, 373 P.2d 45, 48 (Okla.1962) (when treatment of patient is left in the discretion of hospital personnel under only general orders of a private physician, hospital must exercise ordinary care and attention for the patient).[12] As noted, however, neither of these cases expressly adopted the doctrine of corporate negligence or responsibility as placing an independent duty on hospitals toward their patients in regard to the initial granting of staff privileges to private physicians or review of the privileges once granted. We now believe it is time to adopt this theory of liability to the extent we set out below.[13] We do not, however, believe it

**12.** In fact, in *Weldon* we cited *Darling v. Charleston Community Memorial Hospital*, 33 Ill.2d 326, 211 N.E.2d 253 (1965) *cert. denied*, 383 U.S. 946, 86 S.Ct. 1204, 16 L.Ed.2d 209 (1966), for this proposition and *Darling* is recognized by some courts as the case introducing the doctrine of corporate negligence. *See e.g. Pedroza v. Bryant*, 101 Wash.2d 226, 677 P.2d 166, 168 (1984). *Weldon* may, thus, have foreshadowed our adoption of the doctrine in some form.

**13.** At least twenty-two (22) states have adopted some form of the corporate negligence or responsibility doctrine. *See Insinga v. LaBella*, 543 So.2d 209, 214 f.n. * (Fla.1989). The Florida Supreme Court lists seventeen (17) jurisdictions:

Arizona, California, Colorado, Georgia, Illinois, Michigan, Missouri, Nebraska, Nevada, New Jersey, New York, North Carolina, North Dakota, Texas, Washington, West Virginia and Wisconsin. Our research has revealed that additionally Alabama, Florida in *Insinga*, Ohio, Pennsylvania and Wyoming have adopted some form of the doctrine. *See Clark v. Allied Healthcare Products, Inc.* 601 So.2d 902 (Ala.1992); *Humana Medical Corporation of Alabama v. Traffanstedt*, 597 So.2d 667 (Ala.1992); *Coleman v. Bessemer Carraway Methodist Medical Center*, 589 So.2d 703 (Ala.1991); *Albain v. Flower Hospital*, 50 Ohio St.3d 251, 553 N.E.2d 1038 (1990), *overruled on other grounds, Clark v. Southview Hospital & Family Health Center*, 68 Ohio St.3d 435, 628

is necessary or wise to adopt the doctrine in all its particulars, especially to the extent the doctrine has been interpreted as placing a duty on hospitals to review a privately employed staff physician's work as a matter of course in all individual cases. In our view, the doctrine should generally be limited to imposing a duty of ordinary care on hospitals to ensure that: 1) only competent physicians are granted staff privileges, and 2) once staff privileges have been granted to a competent physician the hospital takes reasonable steps to ensure patient safety when it knows or should know the staff physician has engaged in a pattern of incompetent behavior. We believe the form of the doctrine we adopt today is merely a variation, or a reasonable and needed expansion, on our previous cases which have set out the general duty of hospitals to exercise ordinary care and attention for the safety of their patients. It is an independent duty owed by hospitals directly to their patients, rather than a form of *respondeat superior* or vicarious liability.

The doctrine we adopt does *not* make hospitals insurers of the safety of all patients admitted to the hospital by private physicians holding staff privileges with the hospital. A reasonable approach to the doctrine that we find persuasive is contained in *Albain v. Flower Hospital*, 50 Ohio St.3d 251, 553 N.E.2d 1038 (1990), *overruled on other grounds, Clark v. Southview Hospital & Family Health Center*, 68 Ohio St.3d 435, 628 N.E.2d 46 (1994). In *Albain* the Ohio Supreme Court stated the following:

> In a hospital setting, th[e] rule [of corporate negligence] translates into a duty by the hospital only to grant and to continue staff privileges of the hospital to competent physicians. The hospital may delegate this duty to a staff physician committee, but it cannot escape its duty of care in the process of granting and continuing staff privileges by doing so.

N.E.2d 46 (1994); *Thompson v. Nason Hospital*, 527 Pa. 330, 591 A.2d 703 (1991); *Greenwood v. Wierdsma*, 741 P.2d 1079 (Wyo.1987). We have been unable to find any jurisdiction that has completely rejected the doctrine as a matter of its common law jurisprudence, although the Kansas Supreme Court has, at least, partially rejected

In *Johnson v. Misericordia Comm. Hosp., supra* [99 Wis.2d], at 723, 301 N.W.2d at 164, the Wisconsin Supreme Court set out the proper limits of the hospital's liability:

> "[t]he issue of whether ... [the hospital] should be held to a duty of care in the granting of medical staff privileges depends upon whether it is foreseeable that a hospital's failure to properly investigate and verify the accuracy of an applicant's statements dealing with his training, experience and qualifications as well as to weigh and pass judgment on the applicant would present an unreasonable risk of harm to its patients. The failure of a hospital to scrutinize the credentials of its medical staff applicants could foreseeably result in the appointment of unqualified physicians and surgeons to its staff. Thus, the granting of staff privileges to these doctors would undoubtedly create an unreasonable risk of harm or injury to their patients. Therefore, the failure to investigate a medical staff applicant's qualifications for the privileges requested gives rise to a foreseeable risk of unreasonable harm and ... a hospital has a duty to exercise due care in the selection of its medical staff."

Thus, a plaintiff must demonstrate that but for the hospital's lack of due care in selecting the physician, the physician would not have been granted staff privileges and the plaintiff would not have been injured. Moreover, once a competent and careful physician has been granted staff privileges, the hospital will not thereafter be liable unless it had reason to know that the act of malpractice would most likely take place. That is, where a previously competent physician with staff privileges develops a pattern of incompetence, which the hospital should become aware of through its peer review process, the hospital must stand ready to answer for its retention of such physician.

the doctrine based on a specific **legislative** enactment granting hospitals immunity from liability for rendering professional services within the hospital by a physician licensed to practice medicine and surgery that is not an employee or agent of the hospital. *McVay v. Rich*, 255 Kan. 371, 874 P.2d 641 (1994).

We must stress that this independent duty of the hospital is limited to the exercise of due care in the granting of staff privileges, and the continuation of such privileges, to independent private physicians. A physician's negligence does not automatically mean that the hospital is liable, and does not raise a presumption that the hospital was negligent in granting the physician staff privileges. Nor is a hospital required to constantly supervise and second-guess the activities of its physicians, beyond the duty to remove a known incompetent.....

\* \* \* \* \* \*

In short, the hospital is not the insurer of the skills of physicians to whom it has granted staff privileges. (some citations omitted)

*Albain v. Flower Hospital,* 553 N.E.2d at 1045–1046.

We generally agree with the Ohio Supreme Court's view of the doctrine of corporate negligence. A hospital should have a duty to ensure that staff privileges are granted only to competent physicians. Hospitals should also have a duty to take reasonable action to protect hospital patients from staff physicians who have exhibited a pattern of incompetence. We part with the Ohio Supreme Court, however, on its view staff privileges always must be revoked where a pattern of incompetence is involved. We believe there is no necessity for placing a strict duty on hospitals to cancel staff privileges in every case where a doctor's qualifications or competence have been called into question. In other words, depending on the specific factual situation, a hospital may satisfy the duty to

the patient by taking lesser steps than total or full termination of staff privileges. Such steps may include limitations or restrictions on the staff privileges in regard to certain medical procedures. The duty might also be satisfied by requiring some type of oversight of the physician in certain situations or by requiring consultation with other physicians.

■ Failure to take any such steps, however, does not automatically mean a hospital is liable. We mention these alternatives merely to advise hospitals, and the public, that we see no necessity for putting a straightjacket on hospitals or tying a hospital's hands in dealing with the varied factual situations that might arise. Although complete termination might be appropriate in one situation it may not be in another—and, as with most fact questions generally in tort cases, whether the hospital's acts (or omissions) in any specific situation are reasonable in carrying out the independent duty to its patient will normally be for the jury. *See Flower Hospital v. Hart,* 178 Okla. 447, 62 P.2d 1248, *First Syllabus* (1936) (whether hospital has met its duty of ordinary care toward its patient presents an issue of fact to be determined by the jury).[14]

■ We also note that, like the Ohio Supreme Court, we are aware that a number of our sister jurisdictions have greatly expanded the independent duty of hospitals to require them to totally ensure the patient's safety while at the hospital and to require supervision in individual cases. *Albain, supra,* 553 N.E.2d at 1046. Further, like the Ohio Supreme Court, we are unconvinced of the wisdom of such an approach [*Id.*] and we

14. A hospital may also avoid liability if it can show it has taken reasonable measures to ensure the patient's safety and well-being while at the hospital—steps that might include, but not necessarily be limited to, formulating, adopting and enforcing rules and policies to ensure quality care for the patients. *Thompson v. Nason Hospital,* note 13, *supra,* 591 A.2d at 707. Such rules, to be effective as a defense must, however, be designed so as to include policies to ensure that only competent doctors are both selected and retained on staff. *Insinga v. LaBella,* note 13, *supra,* 543 So.2d at 213. As noted in the text, whether such rules or other steps by the hospital will insulate it from liability for negligence where the evidence is disputed will normally be for the

jury. We also note that although we have used the phrase "pattern of incompetence" we do not foreclose by such use the possibility that one prior episode of physician misconduct may be sufficient to call into play the duty we impose on hospitals. This is so for the reason one prior episode may be so egregious on the part of the doctor that the hospital should know it is dealing with an incompetent. In such a situation the hospital would be under the duty we impose here today to take reasonable steps to ensure patient safety. An example of such a situation would be where an obviously intoxicated physician shows up to perform surgery and he is observed by hospital personnel.

caution that the duty we establish today should not be read so as to place such an expansive new duty on hospitals. The primary medical care giver will remain the independent contractor private physician. A hospital should not be and is not required to constantly supervise and second-guess the activities of staff physicians [*Albain, supra,* 553 N.E.2d at 1046] nor is a hospital required to review a staff physician's diagnosis or treatment in all individual cases.[15]

We merely hold that when a hospital, through its personnel, knows or in the exercise of ordinary care should know that they have granted staff privileges to an incompetent doctor we see no impediment to imposing a duty on the hospital to take some reasonable or appropriate steps to ensure that action is taken to protect patients admitted to the hospital by the private physician and we impose that duty on hospitals.[16] When the breached duty is predicated on the hospital's omission to act, i.e. failure to recommend some action be taken against an allegedly incompetent staff doctor, the hospital can only be held liable if it had reason to know it should have acted. Therefore, knowledge, either actual or constructive, is an essential factor in determining whether the hospital exercised reasonable care or was negligent. *Tucson Medical Center, Inc. v. Misevch, supra,* 113 Ariz. at 36, 545 P.2d at 960. A plaintiff, of course, must prove as in other tort cases that any violation of the duty was the proximate cause of his or her injury. To show causation, a plaintiff must prove some negligence on the part of the doctor involved to establish a causal relation between the hospital's negligence in granting or continuing staff privileges and a plaintiff's injuries. *Johnson v. Misericordia Community Hospital, supra,* 301 N.W.2d at 158.

We believe, failing to impose the above outlined duty on hospitals is to allow hospitals the ability to bury their heads in the sand in the face of known incompetents and to put in the hands of incompetent physicians the tools by which severe injury may be caused. Our holding, thus, rejects any view that a hospital can avoid liability even though it knows or should know it is allowing an incompetent physician to treat patients within the hospital.[17]

## CONCLUSION

Trial errors related solely to the issue of liability may not support the granting of a

15. In our view, a hospital should be required in individual cases (i.e. where prior incompetence of the staff doctor is not in issue) to take reasonable alternative action only in situations where a hospital nurse (or other hospital personnel): 1) knows that a staff physician's diagnosis or treatment is below acceptable medical standards, or 2) the diagnosis or treatment is so obviously negligent as to lead any reasonable person to anticipate substantial injury would result to the patient from following the doctor's course of treatment. *See Blanton v. Moses H. Cone Memorial Hospital, Inc.,* 319 N.C. 372, 354 S.E.2d 455, 458 (1987). Thus, in such individual cases, neither a nurse or her hospital employer will be liable for following the orders of a private independent contractor physician unless such orders are known to be negligent or are obviously negligent. This is so because nurses and other less trained hospital employees cannot and should not be expected to second-guess the orders, diagnosis or treatment of private physicians who have the primary responsibility for the treatment of their patients' maladies by virtue of their superior qualifications absent knowledge of negligent conduct on the part of the physician or obviously negligent conduct by the physician. Of course, when a patient is admitted to a hospital without a private physician and/or hospital employees are not under the direct supervision or control of a private staff physician, a hospital is held to a general negligence standard of ordinary care and attention for the patient's safety commensurate with the physical and mental ailments of the patient. *Flower Hospital v. Hart,* 178 Okla. 447, 62 P.2d 1248, 1249–1250 (1936).

16. As previously noted in the text, the duty we formulate today is also applicable to the initial decision to grant staff privileges. This duty should not be onerous as our statutes already provide that administrators in charge or the governing boards of each hospital licensed by the State Commissioner of Health shall adopt written criteria for use in determining which licensed doctors shall be granted staff privileges. 63 O.S. 1991, § 1–707b.

17. We finally note that the duty we impose on hospitals is not subject to variation by virtue of any locality rule, i.e. the requirement that a medical practitioner be judged by the standards of practice ordinarily employed by similar practitioners in the same or similar communities. We have squarely held the locality rule is inapplicable to hospitals. *Rogers v. Baptist General Convention, Etc.,* 651 P.2d 672, 674 f.n. 1 (Okla. 1982).

remittitur. The trial court was, thus, wrong when he granted the hospital's remittitur motion on this basis. We cannot, however, say that the trial judge abused his discretion, acted arbitrarily or capriciously, or erred on a pure and unmixed question of law, when he granted a new trial based on the admission of evidence he concluded unfairly prejudiced the hospital and resulted in the hospital not receiving a fair trial. We also adopt the doctrine of corporate negligence or responsibility as outlined above and this theory of recovery will be a viable one against the hospital upon retrial of this case. Accordingly, the Memorandum Opinion of the Court of Appeals is VACATED, the judgment of the trial court is **AFFIRMED IN PART, REVERSED IN PART AND THIS MATTER IS REMANDED FOR NEW TRIAL.**

ALMA WILSON, C.J., KAUGER, V.C.J., and OPALA and SUMMERS, JJ., concur.

HARGRAVE and WATT, JJ., concur except dissent from part V(B).

HODGES, J., dissent.

SIMMS, J., filed order on Feb. 23, 1995, stating:

"I concur with the majority in Parts I, II, and III, however, I concur in part and dissent in part to Part IV and dissent to Part V."

HODGES, Justice, dissenting:

As the majority recognizes, plaintiff's case hinged on whether the defendant hospital's Nurse Bowles should have known of the obvious incompetent treatment by Dr. Seal and should have acted to remedy the situation. However, I must disagree with the majority's conclusion that some of the evidence of Dr. Seal's prior conduct was inadmissible because it unfairly prejudiced the defendant.

Evidence of Dr. Seal's prior conduct was relevant to the issue of whether Nurse Bowles should have questioned Dr. Seal's

competency and was negligent in not acting based on her knowledge of Dr. Seal's prior conduct. The probative value of this evidence substantially outweighed any "danger of unfair prejudice." *See* Okla.Stat. tit. 12, § 2403 (1991). Further, any prejudice to the defendant was cured by the trial judge's limiting instruction at the time of admitting the evidence [1] and by the jury instructions at the close of the evidence.

In appellee's trial brief, it raised several other issues in its attempt to persuade the trial judge to grant a new trial, order a remittur, or grant a judgment notwithstanding the verdict. After a review of the record, I find no merit to appellee's arguments and am convinced that the trial judge erred in granting a new trial.

For the above reasons, I would reverse the trial court's order granting a new trial and enter judgment for the plaintiff in the amount of $650,000—the $800,000 jury verdict less the $150,000 settlement.

---

1. The trial judge instructed the jury:
    Ladies and gentlemen, these incidents [of Dr. Seal's prior conduct] that are being testified about don't have any relevance to the proof of what happened in this particular case, and I'm permitting this testimony only to show what was in the mind of the nurses and hospital personnel and how it may have, if in any way, or did affect or should have affected their actions. Now, you're the fact finders and you'll have to ultimately decide all these questions.